**KELLER MEDICAL SPECIALTIES PRODUCTS, Plaintiff,**

v.

**ARMSTRONG MEDICAL INDUSTRIES, INC., an Illinois Corporation, Defendant.**

No. 91 C 4853.

United States District Court, N.D. Illinois, E.D.

Jan. 10, 1994.

---

Leon Zelechowski, Karen T. Moses, Leon Zelechowski, Ltd., Chicago, IL, for plaintiff.

Thomas M. Dethlefs, John Peter Ratnaswamy, Hopkins & Sutter, P.C., Peter B. Freeman, Neal D. Rutstein, Christine M. Cohan, Jenner & Block, Claire Seltz Eichner, Nathaniel I. Grey, P.C., Chicago, IL, for defendant.

## MEMORANDUM DECISION

LEFKOW, Executive United States Magistrate Judge:

Defendant, Armstrong Medical Industries, Inc. ("Armstrong"), has moved for summary

judgment on all counts of the complaint of plaintiff, Keller Medical Specialties Products ("KMSP"). The complaint is based on misrepresentations allegedly made by Armstrong between mid-April, 1988 and December, 1990 in connection with the sale and service of two medical products used to measure respiratory function, (1) peak flow meters manufactured by Clement Clarke International, Ltd. ("Clarke International"), a foreign corporation, and sold under the name of the Mini Wright Peak Flow Meter ("Mini–Meters"), and (2) professional model peak flow meters manufactured by Ferrari's Medical, Inc, a foreign corporation, for whom (at all relevant times) Clarke International served as the exclusive international distributor, and sold by Clarke International under the name of the Wright Peak Flow Meter ("Professional Meters") (collectively "the Meters").[1]

The complaint alleges Armstrong caused *Medical Electronics* magazine to incorrectly list Armstrong as the "manufacturer" of Mini–Meters in its December, 1989 and December, 1990 issues. Complaint, Count I, ¶ 12. In addition, the complaint alleges that from mid-April, 1988 to "at least" mid-April, 1989, Armstrong misrepresented it was the "sole" or "exclusive" distributor, and "the only factory authorized testing and repair facility for [Professional] Meters in the United States." Complaint, Count II, ¶¶ 11–13. KMSP contends that Armstrong's alleged misrepresentations violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Counts I and II); the Illinois common law of unfair competition (Count III); the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2 (Count IV); and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 (Count V), and that KMSP is entitled to an injunction enjoining misrepresentations by Armstrong concerning its status as a manufacturer of Mini–Meters, an accounting of profits and attorney's fees. Armstrong contends that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law because plaintiffs cannot establish their claims under the

Lanham Act, the Illinois common law of unfair competition, the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2, or the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2. Further, Armstrong contends that even if plaintiff could establish any of its claims, there is no available relief.

### *Procedure on Summary Judgment*

█ Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions and affidavits that are part of the record. Fed. R.Civ.P. 56, Notes of Advisory Committee on Rules. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In determining whether any genuine issue of fact exists, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553. A material fact must be outcome determinative under the governing law.

█ Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.1983), the non-moving party's evidence is to be believed and all reasonable inferences from the facts must be viewed in that party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Korf v. Ball State University,* 726 F.2d 1222, 1226 (7th Cir.1984).

### *FACTS*

The facts, stated in a light favorable to plaintiff, are as follows:

---

**1.** Professional Meters are designed for clinical or professional use by hospitals or medical professionals. Mini–Meters are designed for home use.

Armstrong and KMSP are competitors in the sale of medical products. Armstrong, the larger entity of the two, has been in business for decades and sells to customers nationwide. KMSP was formed within the last decade and is operated by two former employees of Armstrong.

From the 1970's through April 12, 1988, Armstrong was the exclusive distributor in the United States of the Meters.[2] On or about April 12, 1988, Armstrong received a letter from Clarke International informing Armstrong "of the new arrangements ... for importing and distributing our ... products in North America," and stating that the "new arrangements are that [Clement Clarke, Inc.] ("C.C., Inc.") [an American affiliate of Clarke International] will be sole importer and prime distributor for our ... respiratory ... products...." and that Clarke International's "plans call for the appointment of additional distributors for respiratory products in North America, and attached are the terms and conditions they will be required to meet." For example, Clarke International required distributors to purchase the Meters in minimum quantities (for which they would receive a wholesale price), to maintain a "testing rig" for Professional Meters and purchase and maintain "an adequate stock of repair and replacement parts." The letter did not terminate Armstrong as a distributor.

In September, 1988, Armstrong filed suit in this court in the case known as *Armstrong*

*Medical Industries, Inc. v. Keller Medical Specialties Products, Inc.,* No. 88 C 7676, 1989 WL 158003, asserting as one of its claims that KMSP had intentionally interfered with its distributorship agreement with Clarke International and that the interference resulted in the termination of the agreement. On December 20, 1989, Judge Hart entered an order in that litigation granting summary judgment to Keller on Armstrong's intentional interference claim. Judge Hart found that the exclusive distributorship agreement was terminable at will and had been properly terminated on April 12, 1988.

Throughout 1988 and 1989, Armstrong remained a distributor of the Meters in North America and continued to be the only reseller of the Meters who met Clarke International's requirements for a distributorship. Armstrong also has continuously maintained the only factory authorized testing, service and repair facility for Professional Meters in the United States, for which it has maintained an inventory of repair and replacement parts.[3]

Throughout 1988 and 1989, C.C., Inc. sold Meters to other retail outlets which did not meet Clarke International's requirements for distributorship. C.C., Inc. also reserved the right to fill orders itself but did not maintain a sales force or function as a distributor in competition with Armstrong or other resellers.

---

**2.** KMSP in its Rule 12(N) statement, has denied this statement proffered by Armstrong. That the relationship was sole and exclusive is not put in dispute by KMSP's evidence. Armstrong relies on the affidavit of Thomas Lehman, who states that he has for nine years been president of Clement Clarke, Inc., an American wholly-owned subsidiary of Boots, PLC, a foreign corporation; that Clarke International is also a wholly-owned subsidiary of Boots, PLC; that during 1987 and until April, 1988, Armstrong was the "sole and exclusive" distributor of both the Professional and the Mini–Meters in the United States. KMSP's denial is based on deposition testimony of Warren G. Armstrong, presumably the 30(b)(6) witness for Armstrong, who equivocated somewhat about whether Armstrong actually had an exclusive agreement for the Mini–Meters—although it was his understanding it was exclusive—and his acknowledgement that one or two other entities (including KMSP) had sold Meters in the United States before April, 1988. KMSP does not controvert the authority of Lehman to

speak for Clarke International, which presumably made the exclusivity arrangement with Armstrong. The testimony of Armstrong and the document attached as Exhibit 4 to KMSP's submission indicate that Armstrong challenged the right of the other sellers to distribute in the United States prior to April, 1988. Thus, the fact that other sellers made sales would not rebut Armstrong's evidence of exclusivity. KMSP has proffered no evidence that anyone else had a distributorship arrangement with a Clarke entity. Therefore, Armstrong's assertion is accepted as a fact about which there is no genuine dispute. In any event, the materiality of this fact is doubtful.

**3.** Although KMSP denies this fact, *see* paragraph 7 of Rule 12(N) statement, it offers no evidence to the contrary and in paragraph 15 admits that it has not alleged or identified in discovery any other factory authorized testing facility in the United States.

On August 12, 1988, Armstrong sent to approximately 7,000 hospitals a "flier" prepared in February, 1988 stating Armstrong was the "sole" distributor of the Meters.

On April 12, 1988, Armstrong had approximately 18 Professional Meters in stock and had 100 Professional Meters on order, which it received shortly after April 12, 1988. The Professional Meters in stock already had affixed to them adhesive labels stating Armstrong was an exclusive distributor and the only factory authorized testing and repair facility. These Professional Meters, if and when they were sold, were shipped with the labels because they had already been tested and packaged before that date, and the labels were very difficult to remove. Armstrong also affixed such labels to the 110 Professional Meters which it received shortly after April 12, 1988. Some of these approximately 118 Professional Meters may never have been shipped to customers, but some were admittedly shipped through approximately early October, 1988. The packages also included instructions for sterilization, maintenance and calibration, stating Armstrong was the only factory authorized testing and repair facility. When Armstrong shipped these Professional Meters, and when it mailed the flier on August 12, 1988, Armstrong believed it was the only distributor of the Meters which met Clarke International's requirements for distributorship and the only factory authorized testing and repair facility, as it, in fact, was. Armstrong knew that other entities were selling Meters, however.

Armstrong did not attach the offending labels to any Professional Meters it ordered after April 12, 1988.

On April 10, 1989, Armstrong provided its sales force with new literature and informed its sales force to cease disseminating the literature stating that Armstrong was the exclusive distributor of the Meters.

In the December, 1989 and December, 1990 issues of *Medical Electronics* magazine, a buyers' guide identified Armstrong as a seller of Mini–Meters and included a list of companies, including Armstrong, headed by the word "Manufacturers." Prior to publication of the 1990 buyers' guide, *Medical Electronics* forwarded a letter to Armstrong requesting that Armstrong approve the listing which was to appear in the buyers' guide. Armstrong returned the letter and enclosed a copy of a press release regarding both the Professional and Mini–Meters. Otherwise, however, no person on behalf of Armstrong ever communicated to *Medical Electronics* that Armstrong has been, is or will be a manufacturer of Mini–Meters.

*Medical Electronics* lists a sole distributor of a foreign-produced product in the buyers' guide as a manufacturer if the distributor notifies *Medical Electronics* that it is the sole distributor of a foreign-produced product.

In September, 1991, Armstrong asked that the magazine remove the information about Mini–Meters and Armstrong from the buyers' guides.

### DISCUSSION

Prior to amendment effective November 16, 1989,[4] section 43(a) of the Lanham Act stated in relevant part:

> Any person who shall … use in connection with any goods or services … any false description or representation, including the words or other symbols tending falsely to describe or represent the same … shall be liable to … any person who believes that he or she is likely to be damaged. …

15 U.S.C. § 1125(a). Armstrong contends that it did not violate this provision. First, Armstrong claims that it made no false representations of the Meters or its services. It contends that because Armstrong was the only distributor of the Meters and the only factory authorized testing and repair facility for Professional Meters at the time the claims to being sole distributor were made, it made no misrepresentation of the Meters or Armstrong's services. It further argues that because the representations that it was an "exclusive" distributor said nothing false about the quality, nature or characteristics of

---

**4.** Both parties believe that the amendments did not alter Section 43(a) in any respect material

here.

any product or service, it did not violate the Lanham Act. It argues that the publisher of *Medical Electronics,* not Armstrong, misrepresented Armstrong as a manufacturer of the Meters. It argues that, even it there was an actionable misrepresentation, there was no customer confusion or loss of sales to KMSP, thus KMSP has no injury.

■ Whether the August 12, 1988 mailing and the package labels in which Armstrong claimed to be the "sole" distributor were misrepresentations turns on whether an entity which did not qualify as a distributor under C.C., Inc.'s written requirements was nonetheless a distributor. The evidence of record reveals no real basis to distinguish a distributor such as Armstrong, which met all the requirements, from other entities to which C.C., Inc. sold Meters—at least the Mini–Meters—for the purpose of resale to the public. Perhaps this goes to the meaning of the word "distributor," particularly as C.C., Inc., objectively speaking, intended it. The indication from the April 12, 1988 letter is that C.C., Inc. intended to permit others to sell its products. The finder of fact would have to decide whether this constituted a distributorship. If so, Armstrong's claim to be the sole distributor was a misrepresentation. Because of this issue of fact, summary judgment is not appropriate.

■ Concerning the claim in the same labels to being an "exclusive" distributor, the undisputed facts demonstrate that this representation was not true at the time the packages were shipped to customers. The question then is whether the delivery to customers of the false claim of exclusivity violated the Lanham Act. Armstrong relies on several cases for the proposition that a claim to exclusivity does not violate the Act because it says nothing about the quality, nature or characteristic of the product or service. In *Monoflo International, Inc. v. Sahm,* 726 F.Supp. 121 (E.D.Va.1989), a manufacturer sued a former European distributor who, in order to get around the manufacturer's refusal to sell to it, obtained product from an American distributor by misrepresenting itself as the exclusive distributor for Europe. The court ruled, as relevant here, that defendant's conduct was not covered by the Lanham Act because the misrepresentation was not made in connection with goods or services. *Id.* at 126–27.

In *H.L. Hayden Co. of New York, Inc. v. Siemens Medical Systems, Inc.,* 879 F.2d 1005, 1022–23 (2d Cir.1989), the district court had held that an ex-distributor who made unauthorized sales of a manufacturer's product did not violate the Act where there was no misrepresentation about the product and where there was no likelihood that the ex-distributor's customers were deceived about the lack of services provided with the product. The appeals court affirmed, noting that the district court had enjoined the distributor on another claim from making any representation that the manufacturer's warranty applied to plaintiff's product purchased from the unauthorized distributor. *Id.*

Armstrong also cites *Truck Components, Inc. v. K–H Corp.,* 776 F.Supp. 405, 410–11 (N.D.Ill.1991), for dismissal of a Lanham Act claim where the misrepresentation did not pertain to a product or service. There plaintiffs complained that defendant represented its intention to manufacture a product where it was prohibited from doing so by a covenant not to compete with plaintiff. The court held that omissions regarding the legal rights of the defendant could not be a basis for Lanham Act liability, stating this "is essentially a breach of contract case." *Id.* at 411.

In *Abernathy & Closther, Ltd. v. E & M Advertising, Inc.,* 553 F.Supp. 834 (E.D.N.Y. 1982), the court denied a preliminary injunction based on its conclusion that defendant's false statement that its offer was an "exclusive T.V. offer" and made "for the first time on T.V.," but which did not refer to the inherent quality or characteristic of defendant's product, was not actionable under the Lanham Act. *Id.* at 837.

KMSP distinguishes all of Armstrong's cases and relies principally on two decisions written by Judge Marshall of this court, *Chromium Industries, Inc. v. Mirror Polishing & Plating Co.,* 448 F.Supp. 544 (N.D.Ill. 1978); and *In Re Uranium Antitrust Litigation,* 473 F.Supp. 393 (N.D.Ill.1979). In *Chromium Industries,* the court ruled that the defendant's false claims that its product was covered by a patent and that the com-

petitor's product infringed, where the avowed purpose of the scheme was to use the claim to capture the competitor's customers, stated a claim under the Lanham Act. "In these circumstances," the court stated, "[defendant's] representations would create a false impression in the trade that it is the exclusive source of [the product]. 448 F.Supp. at 557.

In *Uranium*, the court ruled that the Lanham Act covered the defendant's misrepresentation of its ability to supply its customers, where the misrepresentation did not falsely describe defendant's products or falsely connect its products with plaintiff's products, but where the misrepresentation related to the principal bases of competition between sellers, the ability to supply customers.

Having examined all the cited cases, the court concludes that KMSP has the better of the argument. Although Armstrong would reconcile *Chromium Industries* because the misleading statements regarding whether a process is patented or not "go to an essential characteristic of that product," *see Truck Components,* 776 F.Supp. at 411 n. 1, Judge Marshall himself described *Chromium Industries* more broadly than that in *Uranium*:

> [The Lanham Act] reaches a seller who exaggerates the scope of his patents, thereby creating a false impression that it is the exclusive source of a product, even though there is no misbranding or mislabelling of the article and no misrepresentation of its inherent attributes. *Chromium Industries, supra.*

*Uranium,* 473 F.Supp. at 408. Thus it was not the patent claim but the claim to exclusivity that brought the conduct within Lanham. Concerning *Uranium*, Armstrong argues that KMSP cannot show that the claim to exclusivity relates to the principal bases of competition between the parties, but the court believes an analogy exists. Plaintiff and defendant are selling the same product, the Meters. "It is the same no matter who … sells it." *Id.* at 408. If Armstrong wanted to keep its hold on the market, it could do so by leading the public to believe it was the only source of supply. A potential customer reading the label would assume so from the

claim of exclusivity and would be more likely to order or re-order from Armstrong rather than shop around. Both *Chromium* and *Uranium* counsel in favor of KMSP.

At the same time, Armstrong's own cases are not persuasive of Armstrong's position. *Monoflo* is analogous in that it deals with a claim to exclusivity, but the context is otherwise entirely different. There the defendant made the misrepresentation not to a customer or potential customer but to its seller. Clearly, the misrepresentation was outside the policy underlying the Lanham Act to prohibit unfair competition. The rule of *H.L. Hayden* is that the unauthorized distributor was not required to obtain authorization to sell the manufacturer's trademarked goods, but it was obliged to sell in a manner which did not suggest to prospective customers that it was part of an authorized sales network. 879 F.2d at 1023–24, *relying on Bandag, Inc. v. Al Bolser's Tire Stores, Inc.,* 750 F.2d 903, 911 (Fed.Cir.1984), and *Stormer Div. of Fuqua Industries, Inc. v. Johnson,* 587 F.Supp. 275, 279 (W.D.Mich.1984). This rule is not inconsistent with *Uranium* and *Chromium* and suggests that Armstrong's representation that it had a special connection to the manufacturer should also be treated as within the Act. Finally, *Abernathy & Closther* expresses a more narrow reading of the Lanham Act than this court believes is appropriate. *See, Uranium,* 473 F.Supp. at 407–08, and cases cited therein. Thus, it is concluded that Armstrong's claim to be an exclusive distributor comes within the prohibitions of the Lanham Act.

■ The question whether Armstrong is responsible for the inaccurate listing in *Medical Electronics* comes down to whether the return of the letter containing the copy for publication is a direction to publish a misrepresentation. Although not explicit, the evidence before the court suggests that the publisher would not have published without receiving the letter authorizing the publication. Under these circumstances, Armstrong is responsible unless it can establish that the publisher would have listed it as a manufacturer even though it knew that Armstrong was not a manufacturer, or would have listed it as a manufacturer if it had known that

Armstrong was not a sole distributor (if it was not a sole distributor, as discussed above).

The court notes that KMSP may have some difficulty establishing the other elements of proof if the buyers' guide listing and sales of approximately 100 Meters in 1988–89 are all that occurred. According to *Truck Components*, plaintiff must prove that the defendant's advertisement was

> (1) false and misleading, (2) actually or likely to deceive a substantial segment of [its] audience, (3) material in [its] effect on purchasing decisions, (4) touting goods that entered interstate commerce, and (5) actually or likely to injure the plaintiff.

*Truck Components*, 776 F.Supp. at 408, *citing, Cook, Perkiss & Liehe, Inc. v. Northern California Collection Service, Inc.*, 911 F.2d 242, 244 (9th Cir.1990), *citing, Skil Corp. v. Rockwell Int'l Corp.*, 375 F.Supp. 777, 783 (N.D.Ill.1974). KMSP claims that discovery remains outstanding concerning the extent the misrepresentations were disseminated. This discovery may affect the second and third elements of proof as well as the existence or likelihood of injury to plaintiff. Thus, summary judgment on these issues would be inappropriate.

■ The conclusion above that Armstrong may have been responsible for the listing in *Medical Electronics* resolves the question whether Armstrong violated Illinois common or statutory law. *See Brooks v. Midas–International Corp.*, 47 Ill.App.3d 266, 274, 5 Ill.Dec. 492, 498, 361 N.E.2d 815, 821 (1st Dist.1977) (Common law unfair competition has been codified by the Uniform Deceptive Trade Practices Act, 815 ILCS 510/2). If the law prohibits defendant from causing confusion as to the source of goods, which Armstrong concedes, a misrepresentation that Armstrong was the source of goods when it was not could confuse the buying public. *See id.* at 510/2(2).[5] Similarly, a false representation of oneself as an exclusive distributor asserts "sponsorship, approval, status, affilia-

tion or connection" that one does not have." *See id.* at 510/2(5). To the extent a violation of the Uniform Deceptive Trade Practices Act is also a violation of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 (it proscribes "the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act' "), the same conclusions apply to KMSP's consumer fraud count. These claims, then, withstand summary judgment.

Finally, Armstrong contends that KMSP is entitled to no relief even if its claims should be established. Unless KMSP can demonstrate a violation more recent than December, 1990, or a well-founded threat of a violation in the future, the court will not enter an injunction in connection with any finding of liability. "Federal courts do not, as a rule, enjoin conduct which has been discontinued with no real prospect that it will be repeated." *Ragsdale v. Turnock*, 841 F.2d 1358, 1366 (7th Cir.1988). The allegations asserted in this case are related in time to Armstrong's transition from sole and exclusive distributor status to being one of multiple distributors. There is no evidence of record that this transition is not complete at this point. *See Johnny Carson Apparel, Inc. v. Zeeman Mfg. Co.*, 203 USPQ 585 (N.D.Ga. 1978) (where the acts of trademark infringement had been stopped, and defendants had made clear they did not intend to resume them, no basis for an injunction existed).

Further, Armstrong contends that plaintiff had declined to assert a claim for damages and is not entitled to any profits that Armstrong may have made as a result of unfair competition under either federal or state law. Regarding the Lanham Act, Armstrong relies on the unavailability of an accounting in false advertising claims prior to the November, 1989 amendments. KMSP responds that although it is not seeking damages in the nature of lost good will, lost sales or lost profits, it is seeking "damages in the nature

---

5. Armstrong relies on *Digital Equipment Corp. v. Uniq Digital Technologies, Inc.*, No. 88 C 0644, 1991 WL 34623, 1991 U.S.Dist. LEXIS 2795 (N.D.Ill. Mar. 5, 1991), for its position that Illinois unfair competition law does not prohibit a false representation of exclusivity. This case only held that allegations of tying, monopolizing and breach of contract were outside the scope of unfair competition law. The court did not address the question of false representations of exclusivity.

of an accounting of Armstrong's profits, KMSP's costs and attorney's fees." It points out that some of the violations occurred after the effective date of the amendments.

Since some of the alleged violations occurred after November 16, 1989, the effective date of the 1988 amendments to the Lanham Act, the possibility of an accounting of Armstrong's profits is not foreclosed. The Lanham Act provides for the recovery of (1) defendant's profits; (2) any damages sustained by the plaintiff; and (3) the costs of the action. 15 U.S.C. § 1117. "This recovery is cumulative, that is, the court may award [plaintiff] both its damages and defendants' profits." *Playboy Enterprises, Inc. v. P.K. Sorren Export Co.,* 546 F.Supp. 987, 997 (S.D.Fla.1982). There are different standards for the awarding of each. *Id.* As explained in *Playboy Enterprises,* an accounting for profits is an equitable remedy often justified under an unjust enrichment theory where the defendant's conduct was deliberate and willful. *Id. See Otis Clapp & Son, Inc. v. Filmore Vitamin Co.,* 754 F.2d 738 (7th Cir.1985), *citing Playboy Enterprises, Inc. v. Baccarat Clothing Co.,* 692 F.2d 1272, 1274 (9th Cir.1982) (" 'Subject to the principles of equity,' the Lanham Act allows the successful litigant to recover: '(1) defendant's profits. . . .' The trial court's primary function is to make violations of the Lanham Act unprofitable to the infringing party."); *Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 961 (7th Cir.1992), *quoting Roulo v. Russ Berrie & Co.* 886 F.2d 931, 941 (7th Cir.1989) ("Profits are awarded under different rationales including unjust enrichment, deterrence, and compensation"). If proceeding under an unjust enrichment theory, the court's award shall bear a relationship to the amount of the enrichment received and shall not be a windfall to the plaintiff. *See e.g., Sands, Taylor,* 978 F.2d at 963 & n. 19 (remanding for a redetermination of damages where original award of $24 million in profits constituted a windfall and bore no relationship to defendant's enrichment).

In order to recover damages (apart from defendant's profits), the plaintiff must show that it suffered actual damages. *Playboy Enterprises,* 546 F.Supp. at 998, *citing Mal-*

*tina v. Cawy Bottling Co.,* 613 F.2d 582, 587 (5th Cir.1980). Presumably, plaintiff's inability to establish actual damage would be one factor affecting the court's exercise of discretion in determining whether to award an accounting for profits. But because the appropriate remedy is largely discretionary and subject to equitable principles, the question of appropriate relief must be deferred until after a full presentation of the facts has been made.

Concerning relief under Illinois law, the Deceptive Trade Practices Act provides criminal penalties and injunctive relief, except as it is incorporated into section 2 of the Consumer Fraud and Deceptive Business Practices Act, which Act allows damages on proof thereof. 815 ILCS 505/10a. The parties have not demonstrated whether relief that may be awarded under Illinois law is more limited than that available under the Lanham Act. This issue need not be resolved at this juncture.

For the reasons stated above, the motion for summary judgment is denied.