**AMERICAN NEEDLE & NOVELTY, INC., Plaintiff,**

v.

**DREW PEARSON MARKETING, INC., Defendant.**

**No. 92 C 6649.**

United States District Court, N.D. Illinois, E.D.

April 26, 1993.

---

**1074**

David I. Herbst, Richard S. Rhodes, Stuart N. Rappaport, Thomas P. White, Holleb & Coff, Chicago, IL, for plaintiff.

Cecelia M. Comito, Patricia Lee Refo, Jenner & Block, Chicago, IL, for defendant.

## OPINION AND ORDER

NORGLE, District Judge:

Before the court are defendant Drew Pearson Marketing, Inc.'s ("DPMI") motions to dismiss count III and count IV of plaintiff American Needle & Novelty, Inc.'s ("American Needle") complaint. For the following reasons, the motions are granted.

## FACTS

American Needle is an Illinois corporation in the business of manufacturing licensed headwear upon which appear sports team logos or insignia. Its customers include national chains such as Sears, J.C. Penney's, K–Mart, Walmart, Foot Locker, licensed sportswear chains, ball park and stadium concessionaires, grocery stores and regional discounters. American Needle is a licensee of Major League Baseball, the National Football League, and the National Hockey League. It is not a licensee of the National Basketball Association (the "NBA").

Because it was not an NBA licensee, American Needle entered into a distributorship agreement (the "Agreement") with DPMI, which is a licensee of the NBA, providing American Needle with the right to purchase and distribute NBA licensed products through January 1, 2001. Although American Needle was to be a DPMI distributor for ten years, on September 17th, 1992, DPMI sent a letter to American Needle purporting to terminate the Agreement. DPMI sent a copy of the September 17th letter to officials of the NBA, including an NBA licensing executive whom American Needle had contacted in an effort to obtain a direct license. According to American Needle, the September 17th letter contained numerous false and defamatory statements regarding American Needle's business methods. Counts III and IV of American Needle's complaint are based on the allegedly libelous September 17 letter.

According to the complaint, the September 17th letter states a claim for libel *per se* and violates Section 43(a)(2) of the Lanham Act, 15 U.S.C. § 1125(a)(2). The pertinent portions of the letter complained of are as follows:

This letter is to formally notify you of your company's continual and flagrant breaches of the Distribution Agreement.

Specifically, the terms of the agreement require that "the billing is payable by Distributor upon receipt of invoice from Licensee." I have attached a copy of the aged receivables for your review.

Additionally, we have been notified by you bank that the letter of credit for invoice 5642 in the amount of $14,760.72 is not being honored due to discrepancies in the letter of credit. In the past, these discrepancies would be waived. However, it is apparent by the bank's actions, you have chosen not to do so.

Furthermore, it has been brought to our attention that, in direct violation of the terms and conditions of our agreement and exhibits thereto, your company has been placing purchase orders of product granted to us under our license agreement with our

licensor, directly with overseas factories. It would be understandable if [American Needle] was unaware or oblivious to the terms and conditions and requirements under the Distribution Agreement. However, you and your company know very well the requirements, terms and conditions of the Distribution Agreement and the exhibits attached and has blatantly chosen to ignore them and operate under its own rule. Such conduct cannot be tolerated as it not only damages our business and reputation but jeopardizes our company's relationship with its licensor.

According to American Needle, this language was intended to falsely disparage its commercial activities and business methods, and delivery of the letter to the NBA caused injury to American Needle's standing, goodwill, and general business reputation. DPMI has responded to these claims with motions to dismiss.

### DISCUSSION

On a motion to dismiss, all well-pleaded factual allegations are presumed to be true. *Johnson v. Martin*, 943 F.2d 15, 16 (7th Cir.1991); *Perkins v. Silverstein*, 939 F.2d 463, 466 (7th Cir.1991). The court must view those allegations in the light most favorable to the plaintiff, *Gomez v. Illinois State Board of Education*, 811 F.2d 1030, 1039 (7th Cir.1987), and all reasonable inferences to be drawn from those allegations are also accepted as true. *Meriwether v. Faulkner*, 821 F.2d 408, 410 (7th Cir.), *cert. denied* 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987). Additionally, the court must construe the pleadings liberally, and mere vagueness or lack of detail alone will not constitute sufficient grounds to dismiss a complaint. *Strauss v. City of Chicago*, 760 F.2d 765, 767 (7th Cir.1985). Furthermore, the complaint need not specify the correct legal theory nor point to the right statute to survive a Rule 12(b) motion to dismiss, *Bartholet v. Reishauer A.G.*, 953 F.2d 1073, 1078 (7th Cir.1992); however, the complaint will be dismissed if the plaintiff cannot prove the facts upon which the sought after legal relief is to be granted. *Ross v. Creighton Univ.*, 957 F.2d 410 (7th Cir.1992).

The first of DPMI's motions is directed toward American Needle's defamation claim, which is contained in count III of the complaint. According to count III, forwarding the September 17th letter to the NBA constituted defamation of American Needle's reputation as a corporation, prejudicing American Needle in its business. Furthermore, the complaint states that DPMI's false and misleading description of American Needle's business practices has damaged and will continue to damage American Needle.

Two types of defamatory statements are actionable under Illinois law—defamation *per se* and defamation *per quod.* Statements are defamatory *per se* when they constitute "a serious charge of incapacity or misconduct in words so obviously and naturally harmful that proof of their injurious character can be dispensed with." *Quilici v. Second Amendment Foundation*, 769 F.2d 414 (7th Cir. 1985); *see also Fried v. Jacobson*, 99 Ill.2d 24, 75 Ill.Dec. 398, 457 N.E.2d 392 (1983). The preliminary determination of whether a written statement is *per se* defamatory is a question of law to be resolved by the court. *Chapski v. Copley Press*, 92 Ill.2d 344, 65 Ill.Dec. 884, 442 N.E.2d 195 (1982). In addressing this question, Illinois courts apply the rule of innocent construction to the text of the allegedly offending material. *Id.; John v. Tribune Co.*, 24 Ill.2d 437, 181 N.E.2d 105, *cert. denied*, 371 U.S. 877, 83 S.Ct. 148, 9 L.Ed.2d 114 (1962).

Under the rule of innocent construction, a written statement

> is to be considered in context, with the words and implications therefrom given their natural and obvious meaning; if as so construed, the statement may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff it cannot be actionable *per se.*

*Chapski*, 92 Ill.2d at 352, 65 Ill.Dec. 884, 442 N.E.2d 195. Stripped of innuendo, the September 17th letter may be summarized as follows: American Needle has breached the Agreement; American Needle is delinquent in payments; American Needle knowingly violated the terms and conditions of the Agreement; and the Agreement is terminat-

ed. These statements, while discourteous to American Needle, do not, in obviously and naturally harmful words, constitute a serious charge of incapacity or misconduct. *Quilici,* 769 F.2d at 417. Although the September 17th letter uses passionate words such as "flagrant," "blatantly," and "you ... know very well," the words nevertheless fail to accuse American Needle of fraud or mismanagement, nor do they impugn its business integrity. *Audition Div., Ltd. v. Better Business Bureau, Inc.,* 120 Ill.App.3d 254, 75 Ill.Dec. 947, 951, 458 N.E.2d 115, 119 (1983); *see also Makis v. Area Publications Corp.,* 77 Ill.App.3d 452, 458, 32 Ill.Dec. 804, 808, 395 N.E.2d 1185, 1189 (1979) ("[a]llegations of outstanding debts and the failure of a business venture are neither necessarily injurious to a person's business reputation nor indicative of a lack of integrity in business dealings"). The September 17th letter is reasonably capable of innocent construction, and the language contained therein is not so obviously and naturally harmful that proof of special damages is unnecessary. As such, American Needle's claim of libel *per se* fails.

■ Because the September 17th letter is not defamatory *per se,* it is actionable only through defamation *per quod.* An action for defamation *per quod* is established where a publication is rendered libelous by extrinsic facts or innuendo. *Audition Div., Ltd. v. Better Business Bureau, Inc.,* 120 Ill.App.3d 254, 75 Ill.Dec. 947, 458 N.E.2d 115 (1983). A complaint alleging a claim for defamation *per quod,* therefore, must allege both the extrinsic facts that render the publication defamatory and special damages. *Newell v. Field Enters. Inc.,* 91 Ill.App.3d 735, 47 Ill. Dec. 429, 415 N.E.2d 434 (1980).

Although the court found that the text of the September 17th letter, viewed in context and read as a whole with words given their natural and obvious meanings, does not im-

pugn American Needle, American Needle nevertheless maintains that the letter conveys to the reader that American Needle engages in business activities or methods that lack good faith and fair dealing.[1] Aside from asserting its own interpretation of the September 17th letter, American Needle has not pleaded or shown any extrinsic facts or innuendo which would render the otherwise non-defamatory letter libelous and actionable.

■ Furthermore, American Needle has not asserted any special damages. *Audition Div., Ltd.,* 120 Ill.App.3d at 257–258, 75 Ill. Dec. at 951, 458 N.E.2d at 119; *see also* Fed.R.Civ.P. 9(g) ("when items of special damages are claimed, they shall be specifically stated"). American Needle has simply asserted that the publication of the September 17 letter caused injury to its "standing, goodwill, and general business reputation, particularly with the NBA," and that the letter "damaged and will continue to damage" American Needle. Mere allegations that American Needle suffered an injury as the natural result of the alleged defamation are insufficient to state special damages with adequate specificity. *King v. Armstrong,* 623 F.Supp. 487, 490 (N.D.Ill.1985) (finding that special damages were not pleaded with specificity when plaintiff merely claimed that her reputation was injured).

Because American Needle has failed to allege the special damages, and has also failed to plead extrinsic facts or innuendo sufficient to render the otherwise non-libelous language of the September 17 letter libelous, American Needle cannot assert a claim of defamation *per quod.* Furthermore, because the innocuous language of the September 17 letter cannot support an action for defamation *per se,* Count III of American Needle's complaint must be dismissed.

In addition to allegedly defaming American Needle, the September 17th letter is also

---

1. American Needle states that the September 17th letter makes the following statements:
American Needle has continually and flagrantly breached the Agreement; American Needle has breached the Agreement by *unjustifiably* failing to pay Drew Pearson invoices when due; American Needle intentionally caused a letter of credit to be dishonored by its bank by choosing not to waive certain discrepancies in

the letter of credit; and American Needle has been placing orders directly with overseas factories in violation of the Agreement and Drew Pearson's NBA license, thereby *knowingly* damaging Drew Pearson's business and reputation and jeopardizing its relationship with the NBA.
(The emphasized words do not appear in the September 18 letter.)

purported to represent falsely the nature, characteristics, and qualities of American Needle's commercial activities, which, as a result of the letter's delivery to the NBA, violates § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Section 43(a), as originally enacted, was derived from the common law tort of false advertising—advertising one's own goods to the detriment of a competitor. *See L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.,* 214 F.2d 649 (3rd Cir.1954) (Section 43(a) created a new "statutory civil wrong of false representation of goods in commerce"); *Potucek v. Taylor,* 738 F.Supp. 466, 469 (M.D.N.Y.1990) (Section 43(a) grew out of tort of false advertising). Congress amended § 43(a) enacting the Trademark Law Revision Act of 1988, which has been deemed to have expanded the Lanham Act to include commercial defamation claims. *National Artists Management Co. v. Weaving,* 769 F.Supp. 1224, 1229 (S.D.N.Y.1991); *Monoflo Int'l Inc. v. Sahm,* 726 F.Supp. 121, 126 n. 10 (E.D.Va.1989).

DPMI has moved to dismiss American Needle's § 43(a) claim on the grounds that the September 17th letter is not covered by the Lanham Act because it was not sent to the NBA for purposes of influencing consumers to purchase its licensed headwear. Section 43(a) of the Lanham Act provides in relevant part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

.    .    .    .    .

(B) in commercial *advertising or promotion,* misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (emphasis added). Nothing in the language of § 43(a), contrary to DPMI's position, specifically requires a false representation be intended to influence the ultimate consumer, whoever that might be. "[T]he allegation that the advertising language was false or misleading is sufficient to withstand a motion to dismiss, regardless of to whom the advertising was targeted." *Mylan Laboratories, Inc. v. Pharmaceutical Basics, Inc.,* 808 F.Supp. 446, 459 (D.Md. 1992) (denying motion to dismiss § 43(a) claim where defendant circulated brochures to wholesalers, physicians, and pharmacists who were not the consumers of the defendant's products).

■ Although the Lanham Act does not require allegedly false statements to reach the consuming public before they are actionable, the Act requires that such statements be made in "commercial advertising or promotion." The term "commercial," as used in § 43(a)(2), refers to the business purpose for which the advertising or promotion is used. *National Artists Management,* 769 F.Supp. at 1232 (commercial advertising means advertising "for business purposes"); *see also* 134 Cong.Rec. S16973 (October 20, 1988) ("the word 'commercial' is intended only to eliminate any possibility that the section might be applied to political speech"). The September 17th letter discussed the termination of the Agreement and the alleged reasons therefore; accordingly, American Needle's § 43(a)(2) claim rests on whether the September 17th letter constitutes "advertising or promotion."

Neither "advertising" nor "promotion" are defined within the Lanham Act. As defined by Webster's, advertising is "the action of calling something to the attention of the *public* [especially] by paid announcements." Webster's Ninth New Collegiate Dictionary 59 (1986). The concept of public notification also occurs in the definitions of "advertise" and "advertisement." *Id.* Similarly, the definition of "promotion" utilizes the term "publicity." *Id.* at 942 ("the furtherance of the acceptance and sale of merchandise through advertising, publicity, or discounting"). Nothing in the Lanham Act suggests that "advertisement" and "promotion" should be given any interpretation other than their plain and ordinary meanings, which include the notion of public dissemination of informa-

tion. *See Marcyan v. Nissen Corp.*, 578 F.Supp. 485, 507 (N.D.Ind.1982) (plaintiff made no showing that complained of statement "was ever made available to the general purchasing public or in sufficient quantities to constitute an advertisement").

 The September 17th letter was an isolated individualized written statement about American Needle's alleged breach of the Agreement; that letter is at the opposite pole of clearly definable media advertising containing specific verifiable or disprovable statements and given wide distribution in commerce. The level of circulation required to constitute advertising and promotion will undeniably vary from industry to industry and from case to case. *See National Artists Management*, 769 F.Supp. at 1235 (speaking with twenty persons about their relationship with plaintiff in indisputably small and closely interconnected industry constituted commercial advertising and promotion). American Needle claims that, in the licensed headgear industry, the September 17th letter achieves a negative effect on American Needle's commercial activities, and that this effect occurs as surely as if DPMI "had gone to a trade show and there said to retailers in attendance the same things about American Needle that it falsely said in the [September 17th] letter." While American Needle's statement may be correct, the difference is that public dissemination of false information to retailers at a trade show would most likely constitute "commercial advertising and promotion," while a single letter privately addressed to a non-consuming licensor does not.

Section 43(a)(2) contains the words "advertising" and "promotion," which include their attendant requirements of publicity. *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194, 105 S.Ct. 658, 661, 83 L.Ed.2d 582 (1985) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accu-

rately expresses the legislative purpose"). To permit a single private correspondence to constitute either one of these terms for purposes of § 43(a)(2) liability would render their use superfluous and would sweep within the ambit of the Act any disparaging comment made in the context of a commercial transaction. The plain meaning of § 43(a)(2) does not permit this interpretation. Although § 43(a)(2) is intended to reach commercial defamation claims, by its terms it requires more than an allegedly libelous, private letter delivered to a single entity.[2] Therefore, count IV of American Needle's complaint, brought under § 43(a)(2) of the Lanham Act, must be dismissed.

## CONCLUSION

For the foregoing reasons, Count III and Count IV of American Needle's complaint are dismissed.

IT IS SO ORDERED.

---

2. The court notes that although a single, private correspondence is insufficient to find liability under the Lanham Act, commercial entities are not free to defame one another on an isolated basis with impunity. The Lanham Act did not abolish the common law torts of defamation, interference with contractual relationships, or interference with business expectancy or economic advantage, which, among others, could be used to redress any harm caused by a defamatory statement made outside the public-oriented realm of advertising and promotion.