**ULTRA–TEMP CORPORATION,
a Michigan corporation,
Plaintiff,**

v.

**ADVANCED VACUUM SYSTEMS,
INC., Defendant.**

**Civil Action No. 93–10102–RBC.[1]**

United States District Court,
D. Massachusetts.

Nov. 9, 1998.

---

1. With the parties' consent, this case has been referred and reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c).

Ralph A. Loren, Lahive & Cockfield, Boston, MA, Douglas W. Sprinkle, Ellen S. Co-

gen Lipton, Gifford, Krass, Groh, Sprinkle, Patmore, Anderson & Citkowsk, Birmingham, MI, for Plaintiff.

Brandon F. White, Michael A. Albert, Foley, Hoag & Eliot, Boston, MA, Robert E. Wagner, Richard C. Himelhoch, Thomas K. Stine, Wallenstein, Wagner & Hattis, Ltd., Chicago, IL, Jeffrey R. Gargano, Linda A. Kuczma, Wallenstein & Wagner, Ltd., Chicago, IL, for Defendant.

## OPINION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT THAT IT DID NOT VIOLATE SECTION 43(a) OF THE LANHAM ACT (# 192).

COLLINGS, United States Magistrate Judge.

### I. Introduction

In the sole remaining count of its First Amended Complaint, that being Count VI, plaintiff Ultra–Temp Corporation ("Ultra–Temp") alleges that defendant Advanced Vacuum Systems, Inc. ("AVS") violated section 43(a) of the Lanham Act, 28 U.S.C. § 1125(a). AVS now seeks the entry of judgment as a matter of law in its favor on this extant claim, and to that end has filed a motion for summary judgment (# 192) together with a memorandum of law in support (# 193) and a statement of facts (# 194). In response, Ultra–Temp has duly submitted a brief in opposition to the defendant's dispositive motion together with certain appended exhibits (# 196), although no statement of material facts as to which it is contended that there exists a genuine issue to be tried has been included as mandated under Local Rule 56.1.[2] AVS has moved for leave to file a reply to the plaintiff's submission (# 195), attaching a copy of the reply memorandum to its motion.[3]

With the record now complete, the defendant's motion for summary judgment is in a posture for decision.

---

**2.** The same Local Rule further provides that "[m]aterial facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties." For present purposes, that in es- sence means the defendant's statement of facts (# 194) shall be accepted as true.

**3.** The Court allowed the motion on November 6, 1998.

## II. The Facts

The plaintiff and the defendant were competing manufacturers of low pressure sinter hip furnaces. At some point during the month of January, 1990, Thomas Kershaw, President of Ultra–Temp, and Norman Buck, President of AVS, met to explore the possibility of AVS entering into a licensing agreement for certain Ultra–Temp patents relating to such furnaces. (Statement Of Facts # 194, Exh. A) During this same time period, AVS was negotiating the potential sale of a furnace to General Carbide Corporation ("General Carbide") [4]. (# 194, Exh. C) On or about February 13, 1990, the Director of Sales and Marketing at AVS, John T. O'Malley, wrote a letter to the President of General Carbide, Premo Pappafava, in order to submit proposals # 4313 and # 4314 for the defendant's VLPH Series Vacuum/Low Pressure Hipping Furnaces. (*Id.*) Listed among the notable purported advantages of purchasing an AVS furnace was:

PROCESS INDEMNIFICATION AVS Inc. as an Ultra Temp Corporation Licensee is entitled to both utilize their patented technologies covering designing of Low Pressure Sinter Hip Furnaces, and to indemnify General Carbide on a system basis from litigation pertaining to U.S. Patent # 4,575,449 depicting processing of pressure sintered Tungsten Carbide and continuance patents.

Statement Of Facts # 194, Exh. C.

It is undisputed that at the time this letter was drafted, AVS was not in fact a licensee of patents owned by Ultra–Temp. Further, it is uncontested that this letter was sent directly and only to General Carbide and not otherwise disseminated.[5]

In a subsequent March 2, 1990 letter between the same parties, Mr. O'Malley on behalf of AVS wrote to Mr. Pappafava as follows:

We are pleased to confirm our indemnification against infringement of the below Ultra Temp patents upon receipt of your

written purchase order for the AVS Inc. Pressure Sintering System covered in our quotation # 4313.

Essential Ultra Temp Patents:

| PATENT NUMBER | DESCRIPTION |
| --- | --- |
| 4,575,449 | Metallurgical Process |
| 4,591,481 | Metallurgical Process |
| 4,512,448 | Coffin Delivery System |
| 4,431,605 | Metallurgical Process |
| 4,398,702 | Metallurgical Furnace |
| 4,579,713 | Carbon Control |

Indemnification will also cover other related patents now issued, or to be issued in this hardware/process area. Indemnification is on a per system basis and is not transferable.

Statement Of Facts # 194, Exh. E.

This letter made no reference whatsoever to AVS' purported status as a licensee of Ultra–Temp.

Mr. Kershaw faxed a letter to Mr. Buck on or about March 5, 1990, to express his regret at the delay in the licensing discussions and also to state that "[i]n order for you to continue with your business, however, I give you my word that a License for no less than two units at a price no less than $160,000 total will be allowed at terms no less than we previously discussed." (# 194, Exh. B) On even date, Mr. Buck responded that "[b]ased on your letter, we are continuing to pursue some very near term opportunities. We understand that the $160,000 number is a 'not to exceed' number, rather than 'no less than' as stated in the letter." (*Id.*) Ultra–Temp and AVS never ultimately entered into a patent licensing agreement.

The terms of the furnace purchase order dated March 30, 1990, submitted by General Carbide to AVS reflect apparent acceptance of the indemnification proposal set forth in the March 2nd letter. Specifically, as an express condition of the sale, AVS was required to provide:

*SYSTEM INDEMNIFICATION*

Permits purchaser to utilize process as detailed in the following patents held by

---

4. General Carbide had previously purchased other furnaces from AVS. (# 194, Exh. G at 102).

5. Apart from this February 13th letter to General Carbide, there has been no evidence proffered to

suggest that AVS ever represented to others in the industry that it was an Ultra–Temp licensee. (# 194, Exh. I)

Ultra Temp Corporation relating to pressure sintering of tungsten carbide.

| PATENT NUMBER | DESCRIPTION |
| --- | --- |
| 4,575,449 | Metallurgical Process |
| 4,591,481 | Metallurgical Process |
| 4,512,448 | Coffin Delivery System |
| 4,431,605 | Metallurgical Process |
| 4,398,702 | Metallurgical Furnace |
| 4,579,713 | Carbon Control |

Indemnification will also cover other related patents now issued, or to be issued in this hardware/process area. Indemnification is on a per system basis and is not transferrable. Any litigation costs concerning use of the above patents are to be borne by AVS, Inc. and AVS, Inc. is to provide the defense.

Statement of Facts # 194, Exh. F.

The purchase order is mute regarding any patent licensing by AVS vis-a-vis the Ultra–Temp patents.

The instant patent infringement suit was instituted on January 19, 1993, and, according to Mr. Pappafava, General Carbide became aware of this lawsuit in early 1993. (# 194, Exh. G at 11) On or about June 28, 1993, General Carbide submitted a purchase order to AVS for another pressure sintering furnace which once more included an indemnification clause with respect to the Ultra–Temp patents, to wit, "AVS is to again defend General Carbide Corporation against any patent infringement as previously stated under our previous purchase order # 30403 dated 3–30–90, a copy of which is attached." (# 194, Exh. H)

During his deposition taken on March 15, 1994, somewhat confusing testimony was elicited from Mr. Pappafava. At one point, Mr. Pappafava stated "[u]p until the time we were informed that there was a lawsuit, we assumed that we were covered, they were covered, they had a patent, or a license to manufacture furnaces under the patent." (# 194, Exh. G at 12) At the time that General Carbide placed the order for the second furnace in June of 1993, Mr. Pappafava testified that even in light of the ongoing litigation between Ultra–Temp and AVS, his company was not worried about

patent infringement "because we were under the assumption that AVS had a licensing agreement as stipulated in their previous quotations to us on furnace No. 1". (# 194, Exh. G at 27)

Mr. Pappafava acknowledged that AVS was providing indemnification with respect to the Ultra–Temp patents, which he understood to mean that General Carbide could utilize the patents and if any problem arose, AVS would deal with it. (*Id.* at 16–7) Further, Mr. Pappafava agreed that General Carbide had required "the inclusion of the indemnification clause against infringement of the Ultra–Temp patents as a condition for placing the order with AVS" for the first furnace. (*Id.* at 21–2)

As a final note, Mr. Pappafava testified that General Carbide purchased the AVS furnace rather than a Ultra–Temp furnace [6] for economic reasons, i.e., the Ultra–Temp furnace was about fifty percent higher in price. (*Id.* at 22–3)

### III.   The Summary Judgment Standard

The summary judgment standard in this Circuit is familiar. When considering the propriety of the entry of summary judgment, the court must determine whether:

> . . . the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is a genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c).

In making this assessment, the Court is to examine the materials presented "in the light most favorable to the nonmoving party and indulge in all inferences in that party's favor." *Moody v. Boston and Maine Corporation,* 921 F.2d 1, 5 (1 Cir.1990) (citation omitted); *Casas Office Machines Inc. v. Mita Copystar America, Inc.,* 42 F.3d 668, 684 (1 Cir.1994).

A factual dispute which is neither "genuine" nor "material" will not survive a

---

6.   General Carbide had received on unsolicited quotation from Ultra–Temp. (# 194, Exh. G at 102)

motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether a factual dispute is "genuine" the Court must determine whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.; see also National Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 735 (1 Cir. 1995); *Vasapolli v. Rostoff,* 39 F.3d 27, 32 (1 Cir., 1994). In weighing whether a factual dispute is "material" the court must examine the substantive law of the case, for "only disputes over the facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *National Amusements,* 43 F.3d at 735; *Vasapolli,* 39 F.3d at 32.

Rule 56 does not permit the party opposed to the summary judgment motion to rest upon the mere allegations or denials in its own pleadings. Rather, as stated by the Supreme Court:

> The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also National Amusements,* 43 F.3d at 735.

### IV. The Law and its Application to the Facts

In relevant part, section 43(a) of the Lanham Act provides:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any such person who believes that he or she is or is likely to be damaged by such act.

Title 15 U.S.C. § 1125(a).

This statutory provision has been construed to

> contain[ ] two separate causes of action for unfair competition. The first prong creates liability for trademark, tradename or trade dress infringement, or for false designation of origin, § 43(a)(1)(A); and the second prong creates liability for false advertising, § 43(a)(1)(B). 3 J. Thomas McCarthy, *McCarthy's (sic) on Trademark and Unfair Competition,* § 27.02[3], at 27–17 (3d ed.1996).

*Brown v. Armstrong,* 957 F.Supp. 1293, 1299–1300 (D.Mass.), *aff'd,* 129 F.3d 1252 (1 Cir.1997).

In Count VI of the First Amended Complaint, Ultra–Temp alleges a claim pursuant to the "false advertising" prong of § 43(a) based upon the defendant's representation to General Carbide that it was a patent licensee of Ultra–Temp. (# 196 at 3)

As articulated in the *Brown* case:

> To prevail on a claim for false advertising under § 43(a)(1)(B) of the Lanham Act, Plaintiffs must establish at least the following three elements:
>
> (1) Defendants made false or deceptive advertisements or representations to customers;
>
> (2) those advertisements deceived a significant portion of the consuming public; and
>
> (3) Plaintiffs were injured by Defendants' conduct.

*Pacamor Bearings, Inc. v. Minebea Co. Ltd.,* 918 F.Supp. 491, 498 (D.N.H.1996): *see also William H. Morris Co. v. Group*

W, Inc., 66 F.3d 255, 257 (9th Cir.1995) (per curiam) (adopting this three-part test).

\*    \*    \*    \*    \*    \*

It is axiomatic that, to establish false advertising, Plaintiffs must identify an advertisement or promotion containing false information. Section 43(a)(1)(B) of the Lanham Act, by its express terms, is limited to misrepresentations contained in "commercial advertising or promotion." 15 U.S.C.A. § 1125(a)(1)(B). To fall within the scope § 43(a)(1)(B), an advertisement or promotion must be:

(1) commercial speech;

(2) by a defendant who is in commercial competition with plaintiff;

(3) for purposes of influencing consumers to buy defendant's goods; ... [and,]

(4) disseminated sufficiently to the relevant purchasing public.

*Gordon and Breach Science Publishers v. American Institute of Physics,* 859 F.Supp. 1521, 1536 (S.D.N.Y.1994); *see also Seven–Up Co. v. Coca–Cola Co.,* 86 F.3d 1379, 1384 (5th Cir.1996) (adopting this four-part test for determining scope of § 43(a)(1)(B)).

*Brown,* 957 F.Supp. at 1301–02; *see also The Gillette Company v. Norelco Consumer Products Company,* 946 F.Supp. 115, 133 (D.Mass.1996).

AVS argues that there are several inadequacies in Ultra–Temp's case and, consequently, the plaintiff cannot prove a claim under section 43(a) of the Lanham Act.

Initially, while admitting that the representation made to General Carbide that it was a patent licensee of Ultra–Temp was false, the defendant asserts that it corrected the statement within about two weeks by virtue of the March 2nd letter. On its face, however, the March 2nd letter does not explicitly retract the misstatement at all. Indeed, no reference whatsoever is made either to patent licensing in general or the misrepresentation in particular. Upon close review, essentially what AVS argues is that in its silence, the March 2nd letter implicitly rectifies the prior misrepresentation.

The defendant attempts to buttress its position by noting that in the purchase order drafted by General Carbide, only the indemnification protection detailed in the March 2nd letter was required of AVS. Both the plaintiff and the defendant concur that, as a matter of law, indemnification is not a license. Although the parties seem clear on this legal principle, the deposition testimony of Mr. Pappafava highlights his apparent lack of clarity. Given this state of the evidence, genuine issues of material fact exist, for example, as to whether the acknowledged misstatement by AVS to General Carbide was retracted or whether General Carbide was deceived by the misrepresentation.

The defendant premises its contention that, in any event, Ultra–Temp was not damaged by AVS' misrepresentation to General Carbide, on the "undisputed" facts that the statement was corrected and not incorporated into the purchase order. The facts, however, are contested and genuine issues exist to be tried.

The focal point in defendant's motion is the fourth prerequisite to liability for "false advertising". When analyzing this last step of the applicable test, a Fifth Circuit observation sets the contextual stage:

Courts have noted that we should give the terms "advertising" and "promotion" their "plain and ordinary meanings." *American Needle & Novelty, Inc. v. Drew Pearson Marketing, Inc.,* 820 F.Supp. 1072, 1077 (N.D.Ill.1993); *see also Alfred Dunhill Ltd. v. Interstate Cigar Co.,* 499 F.2d 232, 236 (2d Cir.1974) ("[N]otwithstanding that § 43(a) applies to a broad range of misrepresentations, it does not have boundless application ... but is limited to false advertising as that term is generally understood.") (internal quotation marks omitted). The courts are also in agreement, however, that "the Act's reach is broader than merely the 'classic advertising campaign.'" *Gordon & Breach,* 859 F.Supp. at 1534 (citing cases).

*Seven–Up Co. v. Coca–Cola Co.,* 86 F.3d 1379, 1384 (5 Cir.1996).

Another useful summary of the law is found in the *Gillette* case viz:

Section 43(a) is a remedial statute and should therefore be broadly construed. *See Seven–Up,* 86 F.3d at 1383; *Gordon & Breach,* 859 F.Supp. at 1532. The statute is not so broad, however, that it includes all statements made by one competitor about its or another competitor's product. *See Garland,* 895 F.Supp. at 279 ("[T]his court has found no indication that Congress, through its use of the language 'commercial advertising or promotion,' intended to extend Lanham Act coverage to every isolated alleged misrepresentation made to a potential customer by a business competitor."); *Mobius Mgmt.,* 880 F.Supp. at 1021 (recognizing that § 43(a) "does not have boundless application") (*quoting Alfred Dunhill Ltd. v. Interstate Cigar Co.,* 499 F.2d 232, 237 (2d Cir.1974)); *American Needle & Novelty, Inc. v. Drew Pearson Marketing, Inc.,* 820 F.Supp. 1072, 1078 (N.D.Ill.1993) (refusing to read § 43(a) so broadly so as to "sweep within the ambit of the Act any disparaging comment made in the context of a commercial transaction").

*Gillette,* 946 F.Supp. at 134.

AVS contends that the representation that AVS was licensed to use Ultra–Temp's patents was an isolated, aberrant statement that was not "disseminated sufficiently to the relevant purchasing public" to constitute "advertising" or "promotion" in order to support a claim under § 43(a). However, as AVS observes, there is a split of authority on the issue of whether a single false statement to a single customer constitutes sufficient dissemination to the purchasing public so as to constitute advertising or promotion upon which to premise liability under the Lanham Act. Surveying the relevant caselaw, a leading treatise reports that "most courts have said no." 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 27:71, at 27–108–109 and n. 8 (1998).

For example, one court has written:

Section 43(a)(2) contains the words "advertising" and "promotion," which include their attendant requirements of publicity. *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 194, 105 S.Ct. 658, 661, 83 L.Ed.2d 582 (1985) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose"). To permit a single private correspondence to constitute either one of these terms for purposes of § 43(a)(2) liability would render their use superfluous and would sweep within the ambit of the Act any disparaging comment made in the context of a commercial transaction. The plain meaning of § 43(a)(2) does not permit this interpretation. Although § 43(a)(2) is intended to reach commercial defamation claims, by its terms it requires more than an allegedly libelous, private letter delivered to a single entity.

*American Needle & Novelty, Inc. v. Drew Pearson Marketing, Inc.,* 820 F.Supp. 1072, 1078 (N.D.Ill., 1993).

Several courts have concurred with the *American Needle* analysis:

Both "advertising" and "promotion," terms not specifically defined in the Lanham Act, include a notion of the public dissemination of information. *American Needle & Novelty, Inc. v. Drew Pearson Marketing, Inc.,* 820 F.Supp. 1072, 1077–78 (N.D.Ill.1993). "The level of circulation required to constitute advertising and promotion will vary from industry to industry and from case to case." *Id.* at 1078.

*Medical Graphics Corp. v. SensorMedics Corp.,* 872 F.Supp. 643, 650 (D.Minn.1994).

Similarly,

After consideration of those cases in which limited dissemination of a statement has been found sufficient to meet the requirements of the Lanham Act, I am nonetheless persuaded that a single letter to a publisher cannot constitute "advertising or promotion" as those terms are commonly understood. In the first instance, those terms connote communication with the consuming public or at least public statements, features of the communication which are entirely absent here. *See American Needle,* 820 F.Supp. at 1077. Put another way, the complaint does not allege sufficient dissemination of the statements to constitute advertising or promotion. A

single communication, without any allegation that it was part of a pattern or campaign to penetrate more of the relevant market is insufficient. Otherwise, the statutory phrase "commercial advertising or promotion" is devoid of meaning. Only if Congress had considerably broadened the reach of the statute, for instance by use of the term "commercial speech" or "commercial communication", would it have covered the conduct alleged here.

*Goldsmith v. Polygram Diversified Ventures, Inc.,* 37 U.S.P.Q.2d 1321, 1326 (S.D.N.Y., 1995).

Disagreeing with the defendant's line of authority, Ultra–Temp relies primarily upon the decision in *Mobius Management Systems, Inc. v. Fourth Dimension Software, Inc.,* 880 F.Supp. 1005 (S.D.N.Y. 1994). In the *Mobius* case, the plaintiff and defendant were competitors in the development and sale of software products to customers using IBM mainframe computers. Mobius commenced a Lanham Act case against Fourth Dimension after Fourth Dimension allegedly provided a potential Mobius customer with a document containing some seventy false statements about Mobius' products. The parties reached a settlement after First Dimension agreed, among other things, that sixty-five of the statements were in fact false and that it would not again disseminate those statements. Later in that year when Mobius and Fourth Dimension were competing for the business of another customer, Fourth Dimension sent a letter to that customer incorporating essentially the same false statements. Mobius then filed another Lanham Act complaint seeking injunctive relief and damages from Fourth Dimension.

One of the arguments advanced by Fourth Dimension was that the letter to the customer " 'did not constitute commercial advertising or promotion within the meaning of section 43(a)' because it was merely a single letter rather than an advertisement disseminated to the public." *Id.* at 1019. The court wrote:

> The more difficult issue is whether Fourth Dimension's letter was "disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' with-

in that industry." *Gordon and Breach [Science Publishers S.A. v. American Institute of Physics,* 859 F.Supp. 1521] at 1535–36 [ (S.D.N.Y.1994) ]. After examining the relevant caselaw and taking into account the remedial purposes of the Lanham Act, I conclude that it was.

> \*　　\*　　\*　　\*　　\*　　\*

> ... Fourth Dimension's letter to M & I was "disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." The letter concerned the competing products, promoted Fourth Dimension's product over that of Mobius, and was aimed directly at a purchaser, indeed, a purchaser that was about to buy plaintiff's product. As I found above, the relevant purchasing market is quite small—tainting the goodwill of plaintiff with one purchaser could easily affect another purchaser's view. Moreover, in this case the true relevant purchasing public consisted solely of M & I. Fourth Dimension learned of M & I's impending purchase of Mobius's product, and, in bad faith, by way of a knowingly and materially false letter, made a last-ditch effort to torpedo Mobius's sale and convince M & I to buy its product instead. Although I recognize that § 43(a) "does not have boundless application," *Alfred Dunhill Ltd. v. Interstate Cigar Co.,* 499 F.2d 232, 237 (2d Cir.1974), to label this behavior as anything but "commercial advertising or promotion" would defeat the broad remedial purposes of the Lanham Act. *See, e.g., PPX Enterprises v. Audio Fidelity Enterprises,* 818 F.2d 266, 270 (2d Cir.1987) (recognizing that, although early interpretations of the Act were narrow, subsequent interpretations demonstrate that the Act reaches a wide variety of deceptive commercial practices); *Gordon and Breach,* 859 F.Supp. at 1532 ("Section 43(a) of the Lanham Act has been characterized as a remedial statute that should be broadly construed.") (citing PPX Enterprises).

*Mobius,* 880 F.Supp. at 1020–21.

The analogy that Ultra–Temp would make to the facts of the present case is obvious. As in *Mobius,* the plaintiff and defendant

herein were direct competitors in a small purchasing market when AVS made a false representation to a potential customer in order to promote its furnace. Applying the *Mobius* reasoning, in Ultra–Temp's view the single misrepresentation by AVS to General Carbide was adequate dissemination upon which to base liability under the Lanham Act.

AVS asserts that the present case can be distinguished from *Mobius* by virtue of the difference in the size of the purchasing market. Comparing the affidavit of Mr. Kershaw (# 196, Exh. A [7]) and that of Mr. Buck (# 213, Exh. A), there appears to be a conflict with respect to the parameters of the relevant purchasing market. For instance, Mr. Kershaw speaks in terms of customers in the United States whereas Mr. Buck describes a potential worldwide clientele. While these discrepancies might be sufficient to raise an issue of material fact, AVS contends that even if Ultra–Temp correctly describes the market, the evidence is not sufficient for a jury to find that AVS' false statement was disseminated adequately to the relevant purchasing public.

AVS contends that ten different customers is significantly greater than the single customer market at issue in *Mobius* and that dissemination of "false advertising" to a sole customer is such a market is not enough under § 43(a).

While *Mobius* may offer support for Ultra–Temp's position, I find that there are several problems with the Court's decision in that case. First, the Court states on pages 1020–21 of its opinion that "[a]s I found above, the relevant purchasing market was quite small ...". However, there is nothing in the earlier portion of the opinion, i.e., "above," which contains that finding or any elaboration on the size or nature of the market. Whether the market consisted of ten prospective customers or more or less is unknown. Second, and perhaps more important, the Court's next statement, in my opinion, reads out of the statute the words "ad-

vertising" or "promotion" as they have been construed in the cases. The Court wrote:

> Moreover, in this case the true purchasing public consisted solely of M & I [because Fourth Dimension] ... in bad faith, by way of a knowingly and materially false letter, made a last-ditch effort to torpedo Mobius's sale and convince M & I to buy its product instead ... [T]o label this behavior as anything but "commercial advertising or promotion" would defeat the broad remedial purposes of the Lanham Act.

*Mobius*, 880 F.Supp. at 1021 (citations omitted).

Thus, under the Court's reasoning, any false statement made only to a single prospective customer about a competitor's product would be deemed to have been "disseminated sufficiently to the relevant purchasing public." This totally eviscerates the requirement.

What seems to be behind the Court's decision is the extreme bad faith with which Fourth Dimension acted. But it is hard to see how a greater degree of bad faith can alter the fact that what was said was said on one occasion to a single prospective customer and not disseminated further. In addition, whether conduct is "advertising" or "promotion" is judged on what is done, not by the bad faith or intent with which it is done. In short, I do not find that the Court in *Mobius* correctly states the law as to what is required to be proven in order to establish "advertising" or "promotion" as that term is used in the Lanham Act.

To the extent that the decision in *Mobius* is based on the bad faith with which Fourth Dimension acted, the case is easily distinguished from the facts of the instant case. Ultra–Temp has offered no evidence to suggest that AVS acted in bad faith, as was the finding with respect to Fourth Dimension. Moreover, again unlike the *Mobius* case, although the representation regarding the defendant's status as a patent licensee was untrue, it was not a statement that disparaged the plaintiff's product in any manner or,

---

**7.** Although AVS argues that Mr. Kershaw's affidavit is deficient in that there is no representation that the affiant had personal knowledge of the potential customer base, as the President of

Ultra–Temp since the early 1980's, the Court is hard-pressed to believe that such matters would not be within the realm of his personal knowledge.

on the facts, was much of an additional inducement given the indemnification clause.

In addition, at least one court has specifically rejected the view espoused in *Mobius:*

This court does not agree with the more expansive reading given to the term "commercial advertising or promotion" by the court in *Mobius.* In looking at the plain language of the statute, this court agrees with the *Medical Graphics* and *American Needle* courts that the term "commercial advertising or promotion" involves a notion of public dissemination of information. Nothing of the sort occurred here. The purchasing public for the competing roofing products at issue here is large, certainly nationwide in scope, and the communication in question is purely isolated, directed at one contractor on one job. Further, this court has found no indication that Congress, through its use of the language "commercial advertising or promotion," intended to extend Lanham Act coverage to every isolated alleged misrepresentation made to a potential customer by a business competitor. As noted by the *American Needle* court, multiple common law torts exist under state law to redress any such harm made outside the public-oriented realm of advertising and promotion. While this court does not purport to set forth a standard regarding the minimum amount of public dissemination required to trigger Lanham Act protection, the court does hold that the single correspondence alleged in this case does not constitute "commercial advertising or promotion" as defined in the Act.

*Garland Company Incorporated v. Ecology Roof Systems Corporation,* 895 F.Supp. 274, 279 (D.Kan.1995).

While there may be factual distinctions to be made among these cases, for instance, that the letter in *American Needle* was sent to a "non-consuming licensor" rather than a member of the purchasing public, nevertheless the legal reasoning and interpretation of § 43(a) of the Lanham Act set forth in these majority of cases is persuasive. Without attempting to define their absolute parameters, the concepts of "advertising" or "promotion" contemplate something more in the realm of public dissemination than what is involved in the case at bar, a single, discrete misrepresentation to one potential customer that did not ultimately become a term or condition of the parties' written contract.

Whatever Ultra–Temp's remedy, if any, may be for AVS' misstatement, it is not an action for false advertising under the Lanham Act.

### V. Conclusion

Since the Court rules that the evidence, taken in the light most favorable to Ultra–Temp, is insufficient for a jury to find that the misrepresentation was "disseminated sufficiently to the relevant purchasing public," AVS' motion for summary judgment on Count VI is allowed. A separate Order to that effect issued on November 6, 1998.