The **WILLIAM H. MORRIS CO.,**
Plaintiff-counter-defendant-
appellant,

v.

**GROUP W, INC.;** Jerry Wilson,
Defendants-counter-claimants-
appellees.

The **WILLIAM H. MORRIS CO.,**
Plaintiff-counter-defendant-
cross-appellee,

v.

**GROUP W, INC.;** Jerry Wilson,
Defendants-counter-claimants-
cross-appellants.

Nos. 94–55365, 94–55453.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 7, 1995.

Decided Sept. 27, 1995.

---

256

Roger Furey and Michael Pollack, Arter & Hadden, Washington, DC, and William S. Davis, Arter & Hadden, Los Angeles, CA, for plaintiff-counter-defendant-appellant-cross-appellee.

Kent B. Goss and Julie G. Duffy, Pillsbury, Madison & Sutro, Los Angeles, CA, for defendants-counter-claimants-appellees-cross-appellants.

Before: BROWNING, NORRIS, and REINHARDT, Circuit Judges.

## OPINION *

PER CURIAM:

### I.

Omicron is a national distributor of the dietary supplement Food Source One.

* Omicron's appeal of the district court's finding on damages and the discovery sanction, as well as Group W's cross-appeal on the breach of con-

Group W, which distributed Food Source One for Omicron, began preparing to market a new, competing product called Food Plus. Omicron learned of this new venture and terminated Group W on October 23, 1991. That same day, Omicron sent a letter to retail pharmacists who carried Food Source One. Omicron's letter was titled "Counterfeit Food Source One & Copyright Infringement," and advised the retail pharmacists that Omicron intended to "vigorously defend its copyrights, trade dress and product integrity." The letter described three suits Omicron had filed charging unfair trade practices in connection with marketing Food Source One substitutes and concluded with this warning and request:

> Beware of anyone attempting to sell you a product they say is "just like Food Source One" or "replaces Food Source one." Please help us protect your rights as a retailer and the integrity of our products. Call me ... if you have any question of whether any product may be illegal infringement on Food Source One.

The letter made no explicit reference to Food Plus.

After a bench trial, the district court concluded that the letter was false or misleading because it implicitly, and falsely, suggested that Food Plus infringed intellectual property rights associated with Food Source One. In reaching this conclusion, the court relied in part on its finding that Omicron learned of Group W's plan to begin marketing Food Plus four days before sending the letter. The court also noted that the description of previous litigation was inaccurate because one of the three cases discussed did not involve Food Source One. The court concluded Omicron had violated section 43(a) of the Lanham Act. Omicron appeals.

## II.

■ To prevail on its claim under section 43(a) of the Lanham Act, Group W must show that 1) Omicron made false or deceptive advertisements and representations to customers; 2) those advertisements and representations actually deceived a significant portion of the consuming public; and 3) Group W was injured by Omicron's conduct. *See Harper House, Inc. v. Thomas Nelson, Inc.,* 889 F.2d 197, 208 (9th Cir.1989).[1]

### A. *False Statement about Previous Litigation*

■ Omicron's false statement that it had brought three cases specifically concerning infringement of Food Source One does not give rise to liability under the Lanham Act. Because Group W claims damages in the form of lost profits, it cannot establish causation unless it can show that the false statement about litigation caused the damage by influencing pharmacists to forego purchasing Food Plus. *See Harper House,* 889 F.2d at 210; *cf. U.S. Healthcare, Inc. v. Blue Cross,* 898 F.2d 914, 922 (3d Cir.1990) (holding that defendant is not liable under the Lanham Act unless the false statement was material because it would be likely to influence the purchasing decision). The record contains no evidence that the erroneous statement had that impact. The fact that Omicron filed two rather than three enforcement suits would be unlikely to influence pharmacists' purchasing decisions—the message that Omicron was willing to defend its intellectual property rights in its products, including Food Source One, would be the same in either case. Accordingly, the false statement about previous litigation "likely had little or no causal connection with any damage [Group W] might have suffered." *Harper House,* 889 F.2d at 210.

### B. *Implicit Reference to Food Plus*

■ Although Omicron's letter contains no literally false statement about Food Plus, "the Lanham Act encompasses more than blatant falsehoods. It embraces innuendo, indirect intimations, and ambiguous suggestions evidenced by the consuming public's

---

tract claim, are addressed in a separate memorandum disposition.

**1.** *Harper House* concerned allegations of false advertising—false representations about the defendant's own product—while at least some of the allegations in this case involve trade libel. We follow the Third Circuit in applying the same test to both types of claims. *See U.S. Healthcare, Inc. v. Blue Cross,* 898 F.2d 914, 921–22 (3d Cir.1990).

misapprehension of the hard facts underlying an advertisement." *Vidal Sassoon, Inc. v. Bristol–Myers Co.,* 661 F.2d 272, 277 (2d Cir.1981) (internal quotation omitted); *see Better Business Bureau of Metropolitan Houston, Inc. v. Medical Directors, Inc.,* 681 F.2d 397, 400 (5th Cir.1982). Omicron's letter warned pharmacists to "beware" of anyone attempting to sell a product "just like Food Source One" or one that "replaces Food Source one." In light of Group W's impending promotion of Food Plus as a substitute product, this language at least implied that Food Plus infringed on rights associated with Food Source One.

■ Where a statement is not literally false and is only misleading in context, however, proof that the advertising actually conveyed the implied message and thereby deceived a significant portion of the recipients becomes critical. *See Johnson & Johnson–Merck Consumer Pharmaceuticals Co. v. Rhone–Poulenc Rorer Pharmaceuticals, Inc.,* 19 F.3d 125, 129–30 (3d Cir.1994); *Johnson & Johnson * Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.,* 960 F.2d 294, 297–98 (2d Cir.1992) (requiring plaintiff to demonstrate that "a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement"); 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 27.07[2][d] (3d ed. 1992) [hereinafter McCarthy]. Omicron clearly had the right to advise pharmacists that it would defend its intellectual property rights vigorously and to ask that they assist in this effort by informing Omicron of any potentially infringing products. Although the context of the letter and some of its language may have intimated that Food Plus was an infringing product, Group W should not be permitted to receive damages from Omicron in the absence of evidence that this was the message Omicron's letter actually conveyed to recipients and that the recipients were therefore deceived.

Group W failed to meet its burden of demonstrating that a *significant* portion of the pharmacists who received Omicron's letter interpreted it as implying that Food Plus was an infringing product. Of the three hundred pharmacies who received the letter, Group W presented testimony of two pharmacists who thought the letter referred to Food Plus, as well as similar testimony from an employee of one of these pharmacists. The only other supporting evidence consisted of statements from the president and an employee of Group W, who recounted telephone calls from pharmacists expressing concern that buying Food Plus might create legal difficulties. Group W's president identified six pharmacists other than the two who testified, while the employee was only able to say that she received "several" such calls.

Crediting the hearsay testimony of Group W's president, Group W thus produced evidence that eight of the three hundred pharmacists—less than 3%—interpreted Omicron's letter as referring to Food Plus. Such a small percentage does not constitute proof that a significant portion of recipients were deceived. *See Johnson & Johnson–Merck,* 19 F.3d at 133–34 (finding a showing that 7.5% of advertising recipients were deceived insufficient under Lanham Act); 4 McCarthy § 32.54[4] (noting that courts have found evidence sufficient where 21 to 34 percent of the recipients were deceived); *cf. id.* § 32.54[1][c] (stating that in the related context of trademarks, a showing that less than 10% of consumers were confused is evidence that confusion is *not* likely).

■ Group W's failure to establish that a significant number of consumers were actually deceived is not necessarily fatal to its case. If Omicron intentionally misled consumers, we would presume consumers were in fact deceived and Omicron would have the burden of demonstrating otherwise.[2] *See Harper*

2. We have previously indicated that this presumption is conditioned on the expenditure of substantial funds by the defendant. *See Jartran,* 793 F.2d at 1041. In the typical false advertising case, this condition is imposed because the misleading statements may not have reached and deceived a substantial portion of consumers unless the defendant spent enough funds to disseminate the statements widely. In this case, however, regardless of how much money Omicron spent, it is clear that all the relevant consumers received the allegedly misleading letter. The

*House,* 889 F.2d at 209; *U–Haul Int'l, Inc. v. Jartran, Inc.,* 793 F.2d 1034, 1040–41 (9th Cir.1986). The district court made no explicit finding that Omicron acted with the intent to deceive the recipients of the letter.[3]

However, some of the district court's findings suggest the court may have implicitly found that Omicron intentionally attempted to deceive. In particular, the court found that Omicron knew of Group W's impending product launch before sending the letter and that Omicron's "false representations were knowingly made." Given the inconclusive state of the record, we remand to allow the district court to make an explicit finding as to whether Omicron acted with the intent to deceive.

REVERSED AND REMANDED.

only issue, therefore, is whether we can presume these recipients were actually misled because Omicron engaged in intentional deception.

**3.** In contrast, the district court specifically found that Group W intended to deceive consumers in its advertising of Food Plus. However, Group W's liability for false advertising is not at issue in this appeal.