AMERICAN BROADCASTING
COMPANY, a Delaware
corporation, Plaintiff,

v.

MALJACK PRODUCTIONS, INC. d/b/a MPI Media Group and MPI Home Video, an Illinois corporation, Defendant,

Maljack Productions, Inc. d/b/a MPI Media Group and MPI Home Video, an Illinois corporation, Third–Party Plaintiff,

v.

British Broadcasting Corporation, a foreign corporation organized under the law of the United Kingdom, Third–Party Defendant.

No. 97 C 6510.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 9, 1998.

David P. Sanders, William A. VanHoene, Jr., Jenner & Block, Chicago, IL, for plaintiff.

Craig M. White, John Sheldon Letchinger, Erin Leigh Bishop, Wildman, Harrold, Allen & Dixon, Chicago, IL, for defendants/third-party plaintiff.

Robert A. Filpi, Paul F. Stack, Stack, Filpi & Kakacek, Chicago, IL, Nancy J. Felsten, Kay, Collver & Boose LLP, New York City, for third-party defendant.

## MEMORANDUM OPINION AND ORDER

COAR, District Judge.

This case involves a dispute over the rights to distribute a home videotape of Princess Diana's funeral services. This action was originally filed by American Broadcasting Company ("ABC"), seeking to enjoin Maljack Productions Inc. ("MPI") from releasing a home videotape containing footage from the funeral services on the ground that the release of the funeral footage would violate the British Broadcasting Corporation's ("BBC") copyright in a portion of the footage. On December 18, 1997, ABC's complaint against MPI was dismissed pursuant to the parties' settlement. The remaining claims before this court pertain to MPI's third-party claims against BBC, alleging that BBC intentionally interfered with MPI's contract with ABC (Count I); intentionally interfered with MPI's prospective economic advantage (Count II); made misrepresentations in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), (Count III); and violated the Illinois Consumer Fund and Deceptive Business Practices Act, 815 ILCS 505/2, and the common law bar on unfair competition (Count IV). Before this court is BBC's motion for summary judgment as to Count I. For the reasons stated below, BBC's motion is granted in part and denied in part. MPI's motion is denied.

### I. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Cox v. Acme Health Serv., Inc.,* 55 F.3d 1304, 1308 (7th Cir.1995). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the nonmovant, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106

S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir.1995). The movant has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir.1995). If the movant meets this burden, the non-movant must set forth specific facts that demonstrate the existence of a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552–53. A "metaphysical doubt" with respect to the existence of a genuine issue of triable fact is not enough to preclude summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). "[T]here must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

On cross-motions for summary judgment, each movant must individually satisfy the requirements of Rule 56. *Proviso Association of Retarded Citizens v. Village of Westchester,* 914 F.Supp. 1555, 1560 (N.D.Ill. 1996); *Chicago Truck Drivers, Helpers and Warehouse Workers Union (Ind.) Pension Fund v. Kelly,* 1996 WL 507258, *3 (N.D.Ill. 1996). Thus, the traditional standards for summary judgment still apply even though both parties have moved for summary judgment. *Blum v. Fisher and Fisher, Attorneys at Law,* 961 F.Supp. 1218, 1222 (N.D.Ill. 1997). The Court thus considers the merits of each cross-motion separately and draws all reasonable inferences and resolves all factual uncertainties against the party whose motion is under consideration. *Chicago Truck Driv-*

*ers,* 1996 WL 507258 at *3. This "Janus-like perspective ... sometimes forces the denial of both motions," but only where there are material facts in dispute. *Buttitta v. City of Chicago,* 803 F.Supp. 213, 217 (N.D.Ill.1992), *aff'd,* 9 F.3d 1198 (7th Cir.1993).

## II. Background [1]

On August 31, 1997, Diana, Princess of Wales, was tragically killed in an automobile accident. In the five days that followed her death, extensive preparations were made for her funeral services and the broadcast thereof. On September 6, 1997, with the world watching, funeral services were held.[2] The funeral procession commenced at Kensington Palace, proceeded to Westminster Abbey where the funeral services itself was held, and then proceeded to Marble Arch and to Althrop, where Diana was buried. Some of the most memorable segments of the funeral occurred inside Westminster Abbey and included Elton John's tribute to Diana, "A Candle in the Wind," as well as a eulogy delivered by Diana's brother, Earl Spencer. The Westminster Choir and BBC Singers also sang at the funeral service.

The crux of this dispute relates to broadcast footage of the funeral services inside Westminster Abbey. Only two British news agencies, BBC and International Television News ("ITN"), were authorized to film the services from inside Westminster Abbey. As a result, the two news agencies agreed to license the live broadcast to a number of other news organizations, including ABC. As discussed below, the parties hotly dispute the nature of the arrangement between BBC and ITN and the other news agencies.

Across the Atlantic, MPI had an agreement with ABC to use footage of the funeral for a home video, which MPI intended to sell throughout the United States and elsewhere.

---

1. BBC's statement of undisputed facts pursuant to Local Rule 12(M) is cited herein as "12(M) ¶ ——"; MPI's response to the 12(M) statement is cited as "12(M) Resp. ¶ ——"; MPI's statement of additional facts pursuant to Local Rule 12(N) is cited as "12(N) Reply ¶ ——"; and BBC's reply to MPI's 12(N) statement of additional facts is cited as "12(N) Reply ¶ ——."

2. It is estimated that 2.5 billion people worldwide watched the live broadcast of the funeral procession and services. (12(M) ¶ 20.)

(12(N) ¶¶ 39–40.)[3] ABC received that footage from BBC. ABC testified that it erroneously believed it could grant MPI a video license, and that after BBC informed ABC of its copyright in the funeral footage[4], it sought and obtained an injunction prohibiting MPI from distributing the video. (12(M) ¶¶ 58, 68, 71.)[5] MPI maintains that ABC did have the right to grant MPI the video license and that MPI accordingly had the right to distribute the video. MPI also contends that by sending cease and desist letters to several members of the broadcasting industry including ABC, MPI and Reader's Digest, BBC Worldwide Americas, Inc. ("BBCWA"), BBC's agent in the United States, tortiously interfered with contract and prospective economic advantage and engaged in unfair competition. Finally, MPI alleges that because BBC did not own a copyright in the funeral coverage, its cease and desist letters falsely asserted copyright ownership, thereby violating § 43(a) of the Lanham Act.

### The Copyright Allegations

MPI's claims against BBC hinge on its assertion that it had the right, through ABC, to distribute the video containing the funeral footage and that BBC *falsely* asserted an exclusive copyright interest in that footage. MPI bases its claim on its contention that there was a "pooling" arrangement among

3. In its reply to MPI's 12(N) statement of additional facts, BBC states that paragraphs 1–14 and 39–66 repeat statements made in MPI's 12(M) Statement of Undisputed Facts in support of its motion for summary judgment as to Count I. BBC therefore directs the court to its responses to MPI's 12(M)· statement. Local Rule 12(N)(3)(a) requires a reply "to each numbered paragraph" contained in the non-movant's statement of additional facts, admitting or denying each fact and providing specific references in support of any denial. BBC does not inform the court which paragraphs in the 12(M) statement correspond to the paragraphs in the 12(N) statement. This court will not parse through the various responses related to a separate motion to determine which additional facts BBC admits or denies.

4. MPI points out that BBC never actually watched the home video MPI proposed to distribute and therefore does not know if its copyright was infringed. Presumably, we would not be here today if in fact the video did not contain Westminster Abbey footage, and certainly either ABC or MPI would have promptly informed BBC of this fact.

the agencies whereby all interested news organizations had an unlimited right to utilize the broadcast images as if its own cameras were within Westminster Abbey. (Second Amended Cplt. § 8–9). This fact is crucial because MPI contends that under the "pooling" arrangement, the other news agencies, including ABC, received all rights in the "clean feed" (video footage without BBC commentary) of the funeral footage and that BBC has only a copyright interest in the "dirty feed" (video footage *with* BBC commentary). BBC disagrees vigorously, stating that it merely licensed the live broadcast and has at all times asserted its copyright in and to the clean feed, as well as its commentary. (12(M) ¶ 36.)

In support of its pooling theory, MPI offers expert testimony regarding similar news situations wherein the video coverage was pooled, giving each news agency the unfettered right to subsequently utilize the film footage. (12(N) ¶¶ 22–37). MPI's expert provides examples of pooling arrangements such as the daily coverage of President George Bush's administration, U.S. presidential press conferences, Desert Storm coverage, the O.J. Simpson trial, the Louise Woodward interview, Princess Diana's wedding and coverage of Princess Diana's accident in

5. MPI makes the following general objection to each of BBC's 12(M) facts: "Objection and motion to strike on the grounds that this 'fact' is irrelevant to the pending motion, was not disclosed in BBC's interrogatories, and the Crosby Aff't is incompetent to attest thereto." Local Rule 12(N)(3)(a) provides that a response to a 12(M) statement shall, "in the case of any disagreement," include, "specific references to the affidavits, parts of the record, and other supporting materials relied upon." The majority of MPI's responses to the 12(M) statement of facts contain the blanket objection but fail to dispute the fact or to offer any evidence contradicting the asserted fact—this is an improper response under Rule 12(N). Accordingly, the court will accept all facts that MPI fails to contradict with evidence as true. The court admonishes the parties to read the Federal Rules of Civil Procedure (especially Rule 56) and local Rule 12 and to follow them as they apply to matters in this court. Because litigants frequently fail to follow the rules, this court has issued a standing order on motions for summary judgment to remind the parties of the requirements. Alas, that too was ignored.

Paris. (*Id.*) In addition, immediately after Diana's death, BBC sent an e-mail to its salespeople stating that the funeral would likely be "pooled coverage, *i.e.:* available at no license fee to all." (12(N) ¶ 15.) Notably, MPI offers no evidence of an actual agreement to this effect.[6] Nor does it claim that it relied on the e-mail message (or even knew of its existence) before this lawsuit.

BBC contends that despite the initial e-mail, it ultimately determined that the video coverage from inside Westminster Abbey would not be "pooled," but licensed for live broadcast only. In support of its contentions, BBC points out that BBC and BBC Worldwide in fact received approximately $1 million from licensing the rights to broadcast the funeral coverage, and from the sale of a BBC commemorative video, and that all profits were contributed to Princess Diana's charity.[7] (12(M) ¶ 47.) Further, ABC denies that it had a right to freely distribute or license BBC funeral footage, and ABC testified that there was no pooling arrangement. (12(M) ¶¶ 65–69; Abram's dep. at 61, 68.) Following BBC's assertion of its copyright interest in the footage, ABC in fact abandoned its plans to distribute the home video. (*Id.*) None of the other news agencies distributed or licensed BBC funeral footage. In fact, MPI tried and failed to obtain funeral footage from NBC. (12(M) ¶ 95.) BBC argues that, if all of the news agencies that broadcast the footage had full rights in the clean feed, MPI would have been able to obtain a license to distribute the footage from an organization other than ABC. BBC concludes that the fact that MPI has not obtained such rights is evidence that none of the other news agencies had full rights to BBC funeral footage.

In addition to its claim that ABC had the right to distribute and license the funeral footage under the pooling agreement, MPI contends that BBC's assertion of copyright ownership was false because the Crown, and not BBC, owns all copyright interests in the funeral footage. MPI concludes that BBC did not have the right to use the funeral footage without permission from the Crown. (12(N) ¶¶ 6–14). BBC disputes MPI's claim that the Crown owns the copyright to the funeral footage, producing an affidavit from James Wretham, the Head of Copyright at Her Majesty's Stationary Office, denying Crown ownership of a copyright in the BBC funeral footage and stating that the location agreement between BBC and Westminster Abbey is controlling as to copyright ownership of the footage. (12(N) Reply, Ex. B.)

MPI further claims that pursuant to written contracts with BBC, World Television News ("WTN") had the right to receive and distribute the BBC funeral coverage. (12(N) 68–77). WTN is a company that acquires and distributes news footage, including for home video use. WTN had two contracts with BBC—one that permitted WTN to license BBC news footage for live broadcast and one that permitted WTN to license archived BBC news footage for home video and other use. (12(N) ¶¶ 67–69.) MPI claims that pursuant to these agreements, WTN, and not BBC, has the exclusive right to the clean feed of BBC news coverage. (12(N) ¶ 72.) BBC asserts, however, that the funeral footage did not fall under either of its contracts with WTN because it was "event" footage, rather than "news" footage. (12(M) ¶ 82.) While BBC admits that WTN transmitted the clean feed of the funeral to its subscribers for live broadcast, it denies that WTN has the right to license the clean feed of the funeral footage. (Reply to 12(N) ¶¶ 73–74.) WTN testified, however, that it was under the impression that it did have rights to distribute the clean feed of BBC funeral footage under the WTN/BBC Agreements, and in fact granted permission to a few third parties to use excerpts of BBC

---

6. MPI's assertion that "Shortly after the funeral, WTN [World Television News] was advised that the coverage was pooled" (12(N) ¶ 21), is not only denied by BBC, it is not supported by the deposition testimony cited. In fact, WTN testified that there was no pooling arrangement. (Monson Tr. at 9.)

7. MPI implies that BBC pooled the coverage to avoid the perception that it was improperly making money off this event. (12(N) ¶¶ 18–20.) BBC counters that by donating the proceeds, it avoided such perception even under the licensing arrangement. (12(N) Reply ¶ 20; 12(M) ¶ 47.)

funeral footage.[8] (Monson Tr., p. 12; 12(M) ¶¶ 86-87.) BBC objected to WTN's efforts to license BBC footage. (12(M) ¶ 85, 87.)

Finally, MPI argues that the freelance cameramen hired by BBC in addition to its own employees to film the funeral services, also have a copyright in the funeral footage because they are not BBC employees. BBC counters that the majority of cameramen were BBC employees and that BBC provided the cameras and decided the editorial approach in converting the images from each of the cameras into the funeral footage. (Reply Mem. at 8 and accompanying citations.) In addition, under BBC's standard terms, short term contract staff such as the freelance cameramen assign to the BBC the complete copyright in the product of the camera operator's services. (Broadfoot Aff't, attached to Reply Mem.)

BBC offers additional facts to support its copyright claim. Most significantly, BBC holds a United States copyright registration PA856541 for "The Funeral of Diana; Princess of Wales." (12(M) ¶ 31.) The registration does not on its face limit BBC's rights to film footage with BBC commentary (the dirty feed). (Crosby Aff't, Ex. F.) As additional evidence, BBC offers the location contract between itself and Westminster Abbey, which provides that: "the complete copyright and all rights for all purposes everywhere in all films, video or audio recordings in any media, or photographs made by or on behalf of BBC at the property belong to BBC, its licensees an assigns." (12(M) ¶ 38, Crosby Aff't Ex. E.)[9]

Despite its copyright claims in the funeral footage, BBC has consistently recognized the copyright interests of other parties such as the Royal Family, Elton John and Earl Spencer, in portions of the funeral coverage. (12(M) ¶¶ 40-46.) Elton John and Earl Spencer each hold copyrights to their por-

tions of BBC Funeral Footage. (12(M) ¶ 32.) Accordingly, even BBC did not have the right to freely distribute the funeral footage without the proper authorization. (*Id.*)

### The "Cease and Desist" Letters

Prior to the funeral services, BBCWA sent out approximately fifty cease and desist letters asserting its copyright ownership in BBC interviews with Diana in 1995 and 1997, as well as its upcoming broadcast coverage of the funeral. (12(M) ¶ 57.) After learning about the MPI/ABC contract, on September 9, 1997, BBC sent another letter to ABC and to MPI asserting its copyright in the video coverage of the funeral from the interior of Westminster Abbey and stating that the unauthorized reproduction of that footage "constitutes an infringement of BBC's exclusive rights therein." (12(M) ¶ 61; Crosby Affidavit, Ex. K.) On September 10, 1997, ABC sent a letter to MPI stating that because ABC was unable to obtain permission from BBC to use their funeral footage, MPI was not entitled to proceed with the distribution of the home video. (*Id.,* Exhibit M.) ABC abandoned its home video plans both because of BBC's assertion of copyright, as well as the problems associated with obtaining licensing privileges from Elton John and Earl Spencer. (12(M) ¶¶ 65-69.)

In or around the first week of September 1997, MPI had a single telephone discussion with Reader's Digest Association ("Reader's Digest") regarding the possibility that MPI would produce a custom home video of the funeral for Reader's Digest. (12(M) ¶ 74.) On or about September 15, 1997, BBCWA sent a cease and desist letter to Reader's Digest advising of BBC's copyright in the funeral footage. (12(M) ¶ 75.) Reader's Digest had no further discussions with MPI about a custom home video of the funeral. (12(M) ¶ 76.) Without BBC involvement,

8. MPI also argues that because ABC is an 80% shareholder in WTN, and because WTN allegedly had the rights to distribute the clean feed in the funeral coverage, ABC also had the right to license the video footage to MPI for its home video. ABC denies that it had such a right in the footage. Moreover, ABC's purported license to MPI was not through WTN, nor did MPI ever obtain a license from WTN. (12(M) ¶ 96.)

9. MPI disputes this fact on the basis that the location agreement was not signed. In its reply, however, BBC attaches the affidavit of the Assistant Receiver General of Westminster Abbey attesting that a signed copy of the location agreement was located in the Abbey's files and attaching a copy of the signed agreement dated September 8, 1997. (Carson Aff't attached to Reply Memorandum.)

Reader's Digest eventually obtained funeral footage through WTN. (12(M) ¶ 77.)

### Tortious Interference Allegations

In addition to MPI's claim that BBC's cease and desist letter tortiously interfered with its contract with ABC and its prospective economic advantage, MPI alleges that BBC tortiously interfered with its prospective economic relationship with one of its regular customers, Randy Stout ("Stout"). Stout is the Director of Commercial Programming for the Adventist Media Center, the producer of a television program called "It Is Written." (12(M) ¶ 98.)

In November 1997, BBC advised Stout that BBC and MPI were engaged in pending litigation regarding MPI's announced release of a video including footage of the Diana funeral in which BBC owned a copyright interest. (*Id.*) Stout also testified that BBC's representative stated that MPI's conduct had been "illegal." (*Id.*) Stout testified that he understood this to be a statement of opinion, and that he formed no opinion as to whether MPI acted illegally or not. (12(M) ¶¶ 100, 102.) Stout did cancel an order he had placed with MPI for stock footage unrelated to Diana or the funeral because he obtained a better price for a wider range of footage from BBC. Stout states that he still considers MPI to be one of his primary sources of stock footage and intends to continue doing business with MPI in the future. (12(M) ¶ 103.) Finally, Stout testified that the statements made by BBC to Stout had no impact upon his business dealings with MPI or his view of MPI and its reputation. (12(M) ¶ 104.)

### III. Analysis

As an initial matter, MPI argues that BBC's motion for summary judgment should be denied on the ground that BBC did not comply with MPI's discovery requests, including document requests. On October 28, 1998, this court denied MPI's motion to preclude evidence, which was based on BBC's alleged discovery abuses. The issue of BBC's compliance with discovery is therefore moot and will not be considered by the court as a basis for denying summary judgment.

Moreover, MPI's motion to strike each of BBC's 12(M) facts on the grounds that the fact "is irrelevant to the pending motion, was not disclosed in BBC's interrogatories, and the Crosby affidavit is incompetent to attest thereto," is denied. Not only did MPI allege many of the same facts in its 12(N) statement, but the court finds the facts reiterated above to be relevant. As stated, the court has already ruled on MPI's discovery abuse allegations. Finally, the court finds that the documents attached to the Crosby affidavit speak for themselves and need not be verified by affidavit. See Local Rule 12(M) and (N) (statement of facts shall include references to affidavits, *parts of the record and other supporting material* relied upon to support the facts set forth).

### A. Tortious Interference

MPI seeks recovery for tortious interference with contract regarding ABC's abandonment of its home video plans with MPI. In addition, MPI seeks damages for tortious interference with prospective economic advantage in relation to BBC's cease and desist letters to several news and broadcast organizations and to Reader's Digest, and in relation to BBC's statements to Stout.

To succeed on a claim for tortious interference with contract, MPI must show: (1) the existence of a valid and enforceable contract between MPI and ABC; (2) BBC's awareness of this contractual relation; (3) BBC's intentional and unjustified inducement of a breach of the contract; and (4) damages resulting from BBC's interference. *HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 154–55, 137 Ill. Dec. 19, 545 N.E.2d 672, 676 (1989); *Roy v. Coyne*, 259 Ill.App.3d 269, 275, 196 Ill.Dec. 859, 630 N.E.2d 1024, 1028 (1st Dist.1994); *Stonestreet Marketing Services, Inc. v. Chicago Custom Engraving, Inc.*, 1994 WL 162824 (N.D.Ill.1994). BBC challenges only the third element of MPI's tortious interference with contract claim on the basis that its conduct was privileged. BBC contends that MPI cannot meet its burden of demonstrating that BBC's privileged conduct was unjustified or malicious. *See HPI Health Care*, 131 Ill.2d at 156, 137 Ill.Dec. 19, 545 N.E.2d

at 677 (holding that where the conduct of a defendant is privileged, plaintiff bears burden of pleading and proving that the defendant's conduct was unjustified or malicious). The court addresses BBC's privilege argument and MPI's bad faith argument below.

As for MPI's tortious interference with prospective economic advantage claim, MPI must prove: (1) MPI's reasonable expectation of entering a valid business relationship; (2) BBC's knowledge of MPI's expectancy; (3) purposeful interference by BBC that prevents MPI's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the MPI resulting from such interference. *Fellhauer v. City of Geneva,* 142 Ill.2d 495, 510, 154 Ill.Dec. 649, 568 N.E.2d 870, 878 (1991); *Delloma v. Consolidation Coal Company,* 996 F.2d 168, 171 (7th Cir.1993). BBC challenges the sufficiency of MPI's evidence on each of the tortious interference with prospective economic advantage elements.

■ First, BBC contends that MPI did not have a reasonable expectancy of entering a valid business relationship with any of the recipients of the cease and desist letters, including Reader's Digest, and that even if it did, BBC was not aware of that expectancy. The court agrees that no reasonable juror could conclude that MPI had a reasonable expectancy of entering into a valid business relationship with any of the recipients of the fifty or so cease and desist letters sent the first week of September 1997, much less that BBC knew of such expectancy. The court finds, however, that a reasonable juror could find a single phone call with Reader's Digest sufficient to create a reasonable business expectancy and that BBC was aware of that expectancy. Further, there is at least a question of fact as to whether MPI had a reasonable expectancy of entering a valid business relationship with Stout and that BBC was aware of that business expectancy.

■ With respect to the representations made to Stout, BBC also argues that its representations did not prevent MPI's business expectancy from ripening into a valid business relationship, and in fact, Stout testified that BBC's statements did not affect his intention to continue doing business with MPI. BBC further argues that Stout opted to purchase stock footage (unrelated to Diana or the funeral) from BBC, not because of its representation that MPI was acting illegally, but because Stout received a better deal from BBC. Stout's testimony to this effect is uncontradicted. Given this testimony as well as Stout's testimony that he expected to do business with MPI on the same basis in the future, MPI cannot meet the last element of his tortious interference claim—damages. MPI has not produced sufficient evidence for a reasonable factfinder to conclude that MPI's future economic relationship with Stout was damaged by BBC's representations.

■ Moreover, the only evidence MPI offers of tortious interference with respect to Stout is suspicious timing—MPI alleges that Stout opted to purchase unrelated stock footage from BBC following BBC's statement that MPI acted "illegally" with respect to the funeral footage. The mere fact that Stout opted to purchase stock footage from BBC and not MPI is not by itself evidence of tortious interference, however. "A defendant is privileged to interfere with a competitor's relationship with a third party unless that party acted with malice, or utilized wrongful means." *Lynchval Systems, Inc. v. Chicago Consulting Actuaries, Inc.,* 1998 WL 151814 (N.D.Ill.1998) (citing *Ray Dancer v. DMC Corp.,* 230 Ill.App.3d 40, 49, 171 Ill. Dec. 824, 594 N.E.2d 1344, 1350 (2nd Dist. 1992)). To be actionable, the acts of competition must include wrongful conduct such as "fraud, deceit, intimidation, or deliberate disparagement." *Speakers of Sport, Inc. v. ProServ, Inc.,* 1998 WL 473469 (N.D.Ill.1998) (Marovich, J.) (citing *Soderlund Brothers, Inc. v. Carrier Corp.,* 278 Ill.App.3d 606, 615, 215 Ill.Dec. 251, 663 N.E.2d 1, 8 (1st Dist. 1995)). BBC's representations to Stout do not rise to this level of wrongful conduct—as discussed more fully below, the court finds that BBC had a good faith belief in the validity of its copyright interest. Nor is the timing truly suspicious—BBC merely offered Stout a better deal, and Stout's testimony is undisputed that he went with BBC because of the better deal, not because of BBC's statements regarding the dispute over the

funeral footage. Accordingly, MPI cannot maintain its claim for tortious interference with prospective economic advantage based on BBC's representations to Stout.

Finally, BBC argues that all of its representations, whether in the cease and desist letters, to Reader's Digest or to Stout, were privileged, and that MPI has failed to provide sufficient evidence that BBC's privileged statements were unjustified or malicious. Because the court finds that MPI cannot maintain its claim for tortious interference with prospective economic advantage with respect to BBC's fifty cease and desist letters and with respect to BBC's representations to Stout, it will only address BBC's privilege argument as it pertains to BBC's letters to Reader's Digest and to ABC.

### 1. Privilege

"Privilege exists if the defendant acted in good faith to protect an interest or uphold a duty." *Delloma,* 996 F.2d at 171; *see also HPI,* 131 Ill.2d at 157, 545 N.E.2d at 677 ("[c]ourts will recognize a privilege in intentional interference with contract cases where the defendant was acting to protect an interest which the law deems to be of equal or greater value than the plaintiff's contractual rights"). Privilege applies both to claims for tortious interference with contract and for tortious interference with prospective economic advantage. *See Delloma,* 996 F.2d at 171.

BBC claims that its conduct with respect to the cease and desist letters was privileged because it was merely acting to protect a recognized interest in its copyright. In support of its argument, BBC relies on the well established principle that the holder of a protected copyright interest has the right to put others on notice of its claim. *See Art Line, Inc. v. Universal Design Collections, Inc.,* 966 F.Supp. 737, 743 (N.D.Ill. 1997) ("[i]t has long been the law in this circuit that an intellectual property right 'holder has the right to defend himself against infringement and to warn purchasers from the alleged infringer that they, too, might be liable to him' through the sending of infringement letters") (quoting *Spangler Candy Co. v. Crystal Pure Candy Co.,* 235 F.Supp. 18, 32 (N.D.Ill.1964)); *Stonestreet*

*Marketing Services,* 1994 WL 162824 * 6; *see also Thermos Company v. Igloo Products Corp.,* 1995 WL 745832 (N.D.Ill.1995) (it is well established in this circuit that trademark holder has right to defend against infringement by sending trademark policing letters).

MPI argues that BBC's conduct was not privileged because BBC did not have a valid copyright in the funeral footage. The court finds, however, that BBC's good faith belief in its copyright interest is sufficient to establish privilege. *See Publications International, Ltd. v. Western Publishing Co., Inc.,* 1994 WL 23008 *1 (N.D.Ill.1994) ("[t]he right of the holder of a trademark [or copyright] to warn others of infringement suits does not depend upon the validity of the trademark [or copyright] so long as the holder believes his claims are valid") (quotation and citation omitted). The evidence demonstrates that BBC believed its copyright was valid. First, a presumption of validity attaches to BBC's certificate of registration of a copyright in the funeral film footage. *Stonestreet Marketing Services,* 1994 WL 162824 * 6. Second, BBC's contract with Westminster Abbey expressly gives BBC the copyright and all rights in the funeral film footage. Finally, BBC asserted its copyright interest before the funeral took place and before it knew about the agreement between ABC and MPI. These facts are sufficient to establish BBC's good faith belief in its copyright.

Because BBC's conduct in protecting its copyright interest in the funeral footage was privileged, MPI has the burden under Illinois law of proving that BBC's conduct was unjustified or malicious. *HPI,* 131 Ill.2d at 156, 137 Ill.Dec. 19, 545 N.E.2d at 677. That is, MPI must show that BBC did not exercise its privilege in good faith. *Stonestreet,* 1994 WL 162824 * 6; *Art Line,* 966 F.Supp. at 743 (right to send infringement letters is limited); *HPI.,* 131 Ill.2d at 156, 137 Ill.Dec. 19, 545 N.E.2d at 677 (the term malicious in the context of interference with contractual relations cases, simply means that the interference must have been intentional and without justification). A defendant who is protected by a privilege is not justified in engaging in conduct which is to-

tally unrelated or even antagonistic to the interest which gave rise to the defendant's privilege. *HPI,* 131 Ill.2d at 158, 137 Ill.Dec. 19, 545 N.E.2d at 678. "A defendant who is protected by a privilege is also unjustified in using illegal means to induce a breach of contract." *Id.* at 159, 137 Ill.Dec. 19, 545 N.E.2d 672.

 MPI argues that even if BBC's conduct was privileged, BBC acted in bad faith, i.e., its conduct was unjustified. MPI offers a number of "red herrings" to support its claim of bad faith. First, without any factual support, MPI concludes that "BBC's litigation threats to ABC and Reader's Digest were made with the intent of injuring MPI's business." (Opp.Mem. at 3) Such conclusory allegations are not evidence of bad faith. MPI's "bad faith" claims also include the following conduct: (1) BBC "indiscriminately" sent 50 notices to broadcasting companies; (2) many letters were signed by a non-lawyer; (3) BBC did not follow-up on its litigation threats in its notices with suit (e.g., bad faith threats of litigation); (4) BBC did not have a copyright registration at the time it sent its cease and desist letters; (5) BBC did not view the proposed video tape to determine whether it contained Westminster Abbey footage; and (6) BBC's top executives threatened to jeopardize ABC's relationship with BBC if ABC did not cancel its contract with MPI.[10] (*Id.*)

The fifty cease and desist letters are not evidence of bad faith. These letters were sent before BBC learned of MPI's agreement with ABC, and therefore had nothing to do with MPI or with BBC's intention to interfere with MPI's contract or prospective economic advantage. Further, the fact that some of the cease and desist letters were not signed by a lawyer is irrelevant to BBC's good faith belief in its copyright interest. The fact that BBC did not actually sue anyone does not demonstrate bad faith either, given that none of the recipients of the cease

and desist letters (with the exception of MPI) attempted to use the funeral footage from inside Westminster Abbey.

The fact that BBC did not obtain its copyright registration until September 17th, approximately two weeks after the initial cease and desist letters, is another red herring. A copyright registration is not required before making good faith assertion of copyright. *See e.g. Stonestreet,* 1994 WL 162824 (defendant sent a letter notifying party of protected copyright interest on September 16, 1991, and filed copyright registration on September 18, 1991). Finally, the court has already rejected MPI's argument that BBC's failure to view the video is evidence of bad faith. (*See* f.n. 4, *supra.*)

The court thus finds that, as a matter of law, MPI's factual allegations are insufficient to support a claim of bad faith. MPI provides no evidence that BBC's conduct was totally unrelated or antagonistic to the interest which gave rise to BBC's privilege, namely its interest in protecting its copyright. Indeed, BBC's cease and desist letters appear entirely consistent with its efforts to prevent the unauthorized use of the funeral footage. Nor has MPI provided any evidence that BBC used illegal means to induce ABC's breach of contract or to interfere with MPI's prospective economic relationship with Reader's Digest. Accordingly, BBC's motion for summary judgment is granted as to Counts I and II. MPI's motion for summary judgment as to Count I is denied.

**B. Lanham Act**

 MPI alleges that BBC's copyright claims violated the § 43(a) of The Lanham Act by "exaggerating the scope of [BBC's] purported copyright," and by "creating a false impression that the BBC is the exclusive source of footage of the funeral and that competitors cannot effectively acquire such footage elsewhere."[11] (Second Am. Third–Party Cplt. ¶ 56.)

10. MPI's allegation that BBC executives threatened jeopardy to ABC's relationship with BBC is not supported by the record, and will not be considered by the court.

11. MPI also alleges a violation of the Lanham Act based on: (1) BBC's "threats of legal action

to enforce its sham copyright"; (2) the allegation that BBC obtained and disseminated a false copyright registration; (3) BBC's disparagement of MPI; and (4) the allegation that BBC induced ABC to file litigation against MPI. Because the cease and desist letters to not mention MPI,

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) provides that:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

The Lanham Act is primarily designed to protect competitors from misrepresentations by a defendant about its own or another's products that relate to the principal bases of competition among sellers—in this case, the ability to license and distribute video footage of Princess Diana's funeral.

To prevail on its Lanham Act claim, MPI must show that (1) BBC made false or deceptive advertisements and representations about its own or MPI's products; (2) those advertisements and representations deceived or are likely to deceive a substantial segment of the intended audience (present or potential customers of MPI or BBC); and (3) MPI was injured by BBC's conduct. *William H. Morris Co. v. Group W, Inc.*, 66 F.3d 255, 257 (9th Cir.1995); *Brandt Consolidated, Inc. v. Agrimar Corp.*, 801 F.Supp. 164, 174 (C.D.Ill. 1992). Unlike the tortious interference

claims, BBC's good faith but mistaken belief in its copyright is not a defense to an action under § 43(a). "The well-settled rule is that there is no requirement under the Lanham Act that a false representation be made willfully or with the intent to deceive." *Zenith Electronics Corp. v. Exzec, Inc.*, 1997 WL 798907 (N.D.Ill.Dec.24, 1997) (quoting *Brandt Consolidated*, 801 F.Supp. at 174).

MPI contends that BBC's copyright representations in its cease and desist letters exaggerated the scope of BBC's copyright and deceived MPI's and BBC's potential customers into believing that BBC was the exclusive legal source of the funeral footage. Because BBC allegedly misled the recipients of the cease and desist letters into believing they would be sued for distributing a home video of Princess Diana's funeral without first obtaining a license from BBC, MPI claims it was prevented from entering into a business relationship with those organizations. BBC argues that: (1) the cease and desist letters did not constitute advertising or promotion; (2) BBC's representations were not false or misleading; and (3) BBC's statements did not pertain to an inherent quality or characteristic of a product, but to MPI's legal rights (or lack thereof) to distribute a product.

### 1. "Advertising" or "Promotion"

■ BBC argues that the statements in its cease and desist letters did not constitute advertising or promotion because the letters "were neither sent to consumers to induce them to purchase either MPI's or BBC's goods or services, nor were they widely disseminated to ·any conceivable 'purchasing public.'" (Dft's Mem. at 9.) The court agrees that the cease and desist letters do not comport with typical concepts of advertising or promotion, *i.e.* representations to consumers about a party's product or service. However, nothing in the language of the Lanham Act "specifically requires a false

---

MPI's disparagement allegation can only be based on BBC's statement to Stout regarding MPI's "illegal" conduct. The statement to Stout does not constitute advertising and promotion under the Lanham Act. *See American Needle & Novelty, Inc. v. Drew Pearson Marketing, Inc.*, 820 F.Supp. 1072, 1078 (N.D.Ill.1993). Further, the court finds as a matter of law that MPI's allega-

tions related to BBC's litigation threats, procurement and production of a copyright registration and inducement of ABC to file an injunction against MPI are not actionable under the Lanham Act because they do not constitute false or deceptive advertisement or representations to customers.

representation be intended to influence the ultimate consumer." *American Needle & Novelty, Inc. v. Drew Pearson Marketing, Inc.*, 820 F.Supp. 1072, 1077 (N.D.Ill.1993).

■ In order to constitute advertising or promotion, statements must be publicly disseminated throughout the relevant industry, but need not be directed to the general public. *Lampi Corp. v. American Power Products, Inc.*, 1994 WL 501996 * 2 (N.D.Ill.1994). The level of circulation required for "public dissemination" will vary depending on the type of industry. *Id.* (citing *American Needle*, 820 F.Supp. at 1077). BBC cites *American Needle* in support of its contention that its cease and desist did not rise to the level of circulation required for public dissemination. MPI argues that the fifty cease and desist letters sent before the funeral, in addition to the letters sent to ABC, MPI and Reader's Digest are sufficiently numerous to constitute public dissemination throughout the relevant industry. The court agrees.

In *American Needle*, the court rejected the plaintiff's claim that a single private correspondence constituted advertising or promotion under the Lanham Act holding that such a finding would render those terms "superfluous and would sweep within the ambit of the Act any disparaging comment made in the context of a commercial transaction." 820 F.Supp. at 1078; *see also U.S. v. Broadway Construction, Inc.*, 1998 WL 246385 * 6 (N.D.Ill.1998) (isolated written statement sent only to the project manager was not disseminated to the public for purposes of the advertising and promotion requirement). In this case, however, BBC sent fifty letters to major members of the broadcasting industry in North America. (Crosby Aff't, Ex. FF.) Further, while not disseminated to the consuming public, the letters were sent to potential customers of BBC and MPI. MPI considers members of the broadcasting industry to be potential customers in

that those organizations hire and pay MPI to produce and distribute home video tapes to the consuming public. Further, these organizations can be considered customers of BBC to the extent they purchase licenses and film footage from BBC.

BBC also argues that its statements cannot be considered advertising or promotion because they did not pertain to an inherent quality or characteristic of a product, but to MPI's legal rights (or lack thereof) to distribute a product. Several courts have held, however, that representations that exaggerate the scope of a patent or other legal right, such as the exclusive right to distribute a product, do violate the Lanham Act. *See Chromium Industries, Inc. v. Mirror Polishing & Plating Co., Inc.*, 448 F.Supp. 544 (N.D.Ill.1978) (claim of product exclusivity); *Keller Medical Specialties Products v. Armstrong Medical Industries, Inc.*, 842 F.Supp. 1086 (N.D.Ill.1994) (representation that "sole" or exclusive distributor). Accordingly, the court finds that BBC's cease and desist letters meet the advertising and promotion requirement for a Lanham Act claim.[12]

### 2. False or Misleading

■ BBC argues that its cease and desist letters were not false or misleading because it possessed a registered copyright in the funeral footage, and that a certificate of registration of a copyright is presumptively valid. While the court recognizes that a copyright registration is presumptively valid, false claims of exclusivity, such as exaggerating the scope of a copyright, are actionable under the Lanham Act. *See Chromium Industries, Inc. v. Mirror Polishing & Plating Co., Inc.* 448 F.Supp. 544, 555 (registration of a trademark is prima facie evidence of the registrant's exclusive right to use the mark in connection with its goods—implicit in an exclusive right is the right to exclude others and monopolize the market). While a Lanham Act claim may not be brought challeng-

---

12. BBC relies on 2nd Circuit authority for the proposition that a false copyright notice alone cannot constitute a false designation of origin within the meaning of § 43(a) of the Lanham Act. *See Lipton v. The Nature Co.*, 71 F.3d 464 (2nd Cir.1995); *EFS Marketing, Inc. v. Russ Berrie & Company, Inc.*, 76 F.3d 487 (2nd Cir.1996). Those cases simply rejected the argument that the use of a copyright notice on the product itself (as opposed to an infringement letter) did not suffice to convert a copyright infringement claim into a Lanham Act claim. These cases do not hold, however, that a representation to members of the industry exaggerating the scope of a copyright is not actionable.

ing the coverage and validity of a presumptively valid copyright, an action will lie for false representations of exclusivity. *Id.* at 557; *see also Keller Medical Specialties Products v. Armstrong Medical Industries, Inc.,* 842 F.Supp. 1086, 1092 (N.D.Ill.1994) (noting that in *Chromium,* it was not the patent claim but the claim to exclusivity that brought the conduct within Lanham and holding that defendant's claim to be an exclusive distributor came within the prohibitions of the Lanham Act); *Brandt Consolidated,* 801 F.Supp. at 174 ("threat to plaintiff's sales posed by Defendant's claims of patent exclusivity raises a viable Lanham Act claim"); *Zenith Electronics,* 1997 WL 798907 * 11 (N.D.Ill. Dec. 24, 1997) (§ 43(a) of Lanham Act reaches a patentee who, by exaggerating the scope of a patent, creates a false impression that they are the exclusive source of the product).

▮ Similarly, while MPI may not challenge the validity of BBC's copyright claim under the Lanham Act, it may challenge BBC's claim to exclusivity in the cease and desist letters. Specifically, MPI may challenge BBC's claim that "BBC is the owner of the copyright in and to the Programs and the unauthorized reproduction, or any other use of the Programs, in whole or in part, constitutes an infringement of BBC's *exclusive* rights therein." (Crosby Aff't Ex. K.)

MPI offers several bases for its contention that BBC's claim of exclusive copyright was false or misleading: (1) under the alleged pooling agreement, all interested news organizations had an unlimited right to utilize the clean feed of the funeral footage; (2) the funeral footage was a Crown copyright, not a BBC copyright; (3) the freelance cameramen hired by the BBC were not BBC employees and so themselves had a copyright in the footage; (4) Westminster Abbey owned a copyright in the footage; and (5) WTN also had the right to distribute and license the BBC film footage under its agreements with BBC.

The court initially notes that MPI's theories are inconsistent. If, under MPI's pooling theory, all the news agencies had a right to freely utilize the funeral footage, then none of the other entities could assert a copyright in the footage, including the Crown, Westminster Abbey, the freelance cameramen or WTN. In any event, MPI has not provided sufficient evidence to support its pooling theory. MPI's pooling theory is belied by the fact that BBC received licensing fees for the broadcast of the funeral; by the undisputed testimony from ABC that it did not have the right to freely distribute and license the footage; and by WTN's testimony that there was no pooling arrangement. Accordingly, no reasonable factfinder could conclude that the news organizations had full rights to utilize the funeral footage under a pooling arrangement.

The court rejects MPI's claims that the Crown owned the copyright in the film footage in light of the Wretham affidavit denying any copyright interest. The court also rejects MPI's claim that Westminster Abbey owned a copyright in the footage in light of the Wretham affidavit, the Carson affidavit and the BBC location agreement with Westminster Abbey. Finally, no reasonable factfinder could conclude that the freelance photographers owned a copyright interest in the funeral footage given the Broadfoot affidavit and the assignment of copyright to BBC. Moreover, it is well established that "[i]f the work is made for hire, the owner [of the copyright] is the employer or other person for whom the work was prepared." *Harris Custom Builders, Inc. v. Hoffmeyer,* 92 F.3d 517, 518 (7th Cir.1996). Here, the work was prepared for and belongs to BBC.

The only credible evidence that BBC did not possess an exclusive copyright in the BBC funeral film footage pertains to WTN's purported right to license the BBC film footage as well. MPI has produced evidence in the form of WTN testimony and the WTN/BBC agreements that WTN had at least a co-existing right to license and distribute the BBC footage to a few organizations, including Reader's Digest, also supports MPI's claim that BBC's copyright in the funeral footage was not exclusive.[13] The court thus

---

**13.** The court also recognizes that Elton John and Earl Spencer had copyright interests in their portion of the Westminster Abbey funeral services. While their permission to distribute the

finds that there is a dispute as to WTN's rights in the funeral footage. Such a legal/factual dispute is material to a determination of whether BBC exaggerated the scope of its copyright in the cease and desist letters.

### 3. Damages and Reliance

"It is well settled that a plaintiff bringing a claim under the Lanham Act, 15 U.S.C. § 1125(a), must show that it has been damaged by the defendant's alleged violation." *Broadway Construction, Inc.*, 1998 WL 246385 * 7. Although BBC did not address whether MPI suffered damages as a result of the representations in the cease and desist letters, there is no evidence in the record that MPI did suffer damages as a result of BBC's initial fifty cease and desist letters. Moreover, the court finds that any allegations of such damages are purely speculative, and that no reasonable factfinder could conclude that MPI was injured by the representations in BBC's fifty cease and desist letters.

■ Moreover, if money damages are sought, the plaintiff must demonstrate actual reliance by the consumer [or intended audience] on the misleading statements. *Id.* As discussed above, MPI has offered no evidence that the recipients of the fifty cease and desist letters refused to contract with MPI in reliance on BBC's statements. There is, however, a question of material fact as to whether Reader's Digest relied on BBC's representations, given that BBC's cease and desist letter expressly refers to MPI and that Reader's Digest ultimately obtained a license for the funeral footage from WTN. (Crosby Aff't, Exs. P, Q.) It is undisputed that ABC canceled its home video plans at least partly in reliance on BBC's assertion of copyright. Accordingly, BBC's motion for summary judgment on the Lanham Act claim is denied as to the allegations pertaining to the ABC and Reader's Digest letters, and granted as to the allegations pertaining to the fifty cease and desist letters.

## C. Consumer Fraud and Deceptive Business Practices Act

■ MPI lumps two causes of action under Count IV of its complaint—Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* ("CFDBPA"), and common law unfair competition.[14] The court will examine the statutory claim separately from the common law claim.

■ BBC contends that MPI fails to provide sufficient evidence of a consumer nexus to sustain its CFDBPA claim. "[W]hen both parties to a lawsuit are commercial entities which are not consumers, the test for standing is whether the alleged conduct invokes trade practices addressed to the market generally or otherwise implicates consumer protection concerns." *Stepan v. Winter Panel Corp.*, 948 F.Supp. 802, 806 (N.D.Ill.1996) (quotations omitted). That is, the CFDBPA grants "businessmen standing to sue to redress competitive injury they suffer when other businessmen deceive *customers.*" *B. Sanfield v. Finlay Fine Jewelry Corp.*, 857 F.Supp. 1241, 1248 (N.D.Ill.1994) (quoting *Downers Grove Volkswagen v. Wigglesworth*, 190 Ill.App.3d 524, 137 Ill.Dec. 409, 546 N.E.2d 33, 39–41 (2nd Dist.1989)). Consequently, claims under the Act must meet the consumer nexus test by alleging that the conduct involves trade practices directed to the market generally or otherwise implicates consumer protection concerns. *Athey Products Corp. v. Harris Bank Roselle*, 89 F.3d 430, 436–37 (7th Cir.1996).

While the Lanham Act does not require that the false or misleading representations reach or even affect the ultimate consumer, the CFDBPA expressly requires "proof of

---

footage of the funeral services was required, they did not have the right to license the BBC funeral film footage, while WTN arguably did have that right.

**14.** MPI also appears to state third claim under Count IV pursuant to the Illinois Deceptive Trade Act, 815 ILCS 510/2. Although the two acts substantially overlap, the Deceptive Trade Act allows injunctive relief only, while the CFDBPA allows for damages. *Lampi Corp.*, 1994 WL 501996 * 3 (N.D.Ill.1994) (citing *Pain Prevention Lab v. Electronic Waveform Labs*, 657 F.Supp. 1486, 1493–94 (N.D.Ill.1987)). Because MPI has not requested injunctive relief, the court will address only MPI's CFDBPA claim.

public injury" or "an effect on consumers generally." 815 ILCS 505/1 *et seq.; Stickle Enterprises, Ltd. v. CPC International, Inc.,* 1997 WL 767301 * 4 (N.D.Ill.1997) ("it has long been recognized that the Act is fundamentally concerned with protecting consumers"); *compare American Needle,* 820 F.Supp. at 1077 (Lanham act derived from concept of advertising one's own goods to the detriment of a competitor—"[n]othing in the language of § 43(a) ... specifically requires a false representation be intended to influence the ultimate consumer, whoever that might be").[15]

Although BBC's cease and desist letters may, under liberal construction, constitute advertising and promotion under the Lanham Act, the court finds that the statements contained in the cease and desist letters are not directed to the market generally and do not otherwise implicate consumer protection concerns. MPI argues that the misrepresentations affect consumers because consumers will not have as many home video tapes of Princess Diana's funeral to choose from. That is, because companies like ABC are not distributing the funeral footage based on BBC's copyright claims, there are less versions of that footage in the market. MPI's argument fails. First, as a practical matter, any organization wishing to distribute a video of the funeral footage not only must obtain a license from BBC, it must obtain permission from Elton John and Earl Spencer. Thus, BBC's representations do not have a direct bearing on the market for home video tapes of Princess Diana's funeral.

More importantly, MPI's argument does not provide a sufficient nexus between BBC's representations and consumer protection concerns. For example, in B. Sanfield, 857 F.Supp. 1241, a jewelry retailer brought an action against its competitor, alleging that its competitor represented that jewelry was sig-

nificantly reduced in price through newspaper advertisements and other promotional materials, when the competitor never actually intended to sell the jewelry at the price from which it was supposedly discounted. 857 F.Supp. 1241. This type of false advertisement has a direct effect on consumers—consumers will think they are getting a good deal when they are really buying the jewelry at full retail price. In this case, whether BBC's copyright representations are true or false has no direct effect on consumers. *See Stepan Company,* 948 F.Supp. at 807 (rejecting argument that misrepresentation affected consumers because consumers ultimately used the product, noting that "almost every product sold by one commercial party to another will ultimately be sold to or otherwise effect [sic] a customer"). Because MPI fails to show the necessary nexus between the complained of behavior and consumer protection concerns generally, BBC's motion for summary judgment as to the Illinois Consumer Fraud and Deceptive Business Practices Act claim is granted.

### D. Common Law Unfair Competition

██ MPI's common law unfair competition claim cannot survive summary judgment for the same reasons that its tortious interference claims fail—MPI cannot as a matter of law demonstrate that BBC acted in bad faith. Indeed, the principal form of the tort of unfair competition "falls under the rubric of tortious interference with prospective economic advantage." *Zenith Electronics Corp. v. Exzec, Inc.,* 1997 WL 223067 * 6 (N.D.Ill. March 27, 1997). The court has held that the right of BBC to warn others of infringement did not depend on the validity of its copyright as long as BBC believed its claims were valid. *See also Heinz v. Frank Lloyd Wright Foundation,* 762 F.Supp. 804, 808 (N.D.Ill.1991) (no likelihood of success on

---

**15.** MPI cites *Spex v. The Joy of Spex, Inc.,* 847 F.Supp. 567 (N.D.Ill.1994), for the proposition that claims for unfair competition and deceptive business practices brought under Illinois statutes are to be resolved according to principles set forth under the Lanham Act. The court interprets this decision to apply to determinations of trademark infringement or "palming off" under the Lanham Act. For example, a determination as to whether there is a likelihood of confusion

would be similar under both the Lanham Act and the Illinois statutes. The requirement that the deceptive practice actually affect the consuming public is unique to the CFDBPA, however. Accordingly, the alleged deceptive business practice must "address the market generally and implicate consumer concerns." *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.,* 857 F.Supp. at 1248 (concluding that claim for false advertising met consumer nexus requirement).

merits of unfair competition claim where "there is no evidence to suggest that [defendant's] actions are anything more than good faith efforts to protect their trademark").

*Heinz* is on point. In that case, plaintiffs alleged that the defendant sent out infringement letters to intimidate and harass plaintiff's customers and that said customers stopped doing business with plaintiffs as a result of the receipt of the infringement letters. The plaintiffs further argued that the defendant misrepresented the scope of its trademarks. The court rejected plaintiff's claim for unfair competition because plaintiffs failed to provide evidence of bad faith and because "plaintiffs make no showing that the [defendant] did not believe that the facts contained in the infringement letters were true." *Id.* at 808. Similarly, even if BBC exaggerated the scope of its copyright, MPI has made no showing that BBC did not believe the facts contained in its cease and desist letters. Because the court finds that BBC's conduct was a good faith effort to protect its copyright, MPI's unfair competition claim cannot survive summary judgment.

## IV. Conclusion

For the foregoing reasons, the British Broadcasting Corporation's motion for summary judgment is granted as to Counts I, II and IV, and denied as to Count III of the Second Amended Third–Party Complaint. Maljack Productions Inc.'s motion for summary judgment as to Count I is denied. As to Count III of the Second Amended Complaint, the issues at trial will be limited to those concerning the ABC and Reader's Digest letters.